[No. S020378. May 14, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES PHILLIP ANDERSON, Defendant and Appellant.

548

558

Alister McAlister, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Laura Whitcomb Halgren and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BAXTER, J.**—In 1979, defendant was convicted of two counts each of first degree murder (Pen. Code, §§ 187, 189),[1] kidnapping for the purpose of robbery (§ 209), and robbery (§ 211) arising from a single incident in March 1979. As to each murder, the special circumstances of multiple murder (§ 190.2, subd. (a)(3)) and robbery murder (§ 190.2, subd. (a)(17)(A)) were found true. The jury sentenced defendant to death. In 1987, we affirmed the guilt judgment, struck one of the multiple-murder special circumstances, and reversed the penalty judgment for so-called *Ramos* error (*People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] [improper Briggs instruction on Governor's commutation power]). (*People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson I*).)

In December 1990 and January 1991, defendant was retried on the issue of penalty. Again he was sentenced to death. This appeal is automatic. (§ 1239, subd. (b).)

We find no reversible error. We therefore affirm the judgment.

### FACTS

The People proffered evidence of (1) the 1979 robbery murders of Donna Coselman and Louise Flanagan, which led to defendant's capital convictions, and (2) the unadjudicated robbery murder of Jack Mackey, allegedly committed by defendant in 1978. Defendant presented no affirmative case in mitigation. As to the capital crimes, he rested his defense on lingering doubt. As to the Mackey incident, he sought to raise a reasonable doubt by mounting an extensive attack on the credibility of the principal prosecution witness. Evidence bearing on the 1978 and 1979 crimes was as follows:

A. *1979 Coselman-Flanagan robbery murders (capital crimes).*

Just after 3:00 p.m. on March 4, 1979, Fred Anders (Fred) approached a parked Indio patrol officer, Ted Fish, and reported a possible murder in a citrus grove off Interstate 10 between Indio and Coachella. Fred directed Fish to the grove, where they were met by other law enforcement officers. Following Fred's lead, officers discovered the body of Donna Coselman. The body was facedown, with ligature marks around the neck. On the basis of Fred's descriptions, Fred's sister Sheila Anders (Sheila) and defendant were soon arrested as they walked near the grove. The next morning, a further search of the grove revealed the body of Coselman's grandmother,

[1]All further statutory references are to the Penal Code unless otherwise indicated.

Louise Flanagan. Flanagan was hanging from a tree by a rope around her neck. Both Coselman and Flanagan died by strangulation.

When arrested, Sheila had Flanagan's watch and purse. Sheila's own purse, found by the police in Fred's car, contained Coselman's wallet.

Fred testified as follows: On the afternoon of March 4, 1979, he was driving his Mercury station wagon on Interstate 10. Defendant and Sheila were passengers. The three came upon a stranded Chevette and stopped. Inside the Chevette were two women, one young and one older. Fred, who had mechanical experience, immediately saw the problem, a loose wire that he could easily repair. However, Fred followed defendant's order to return to the Mercury. Eventually, defendant brought the younger woman (Coselman) to the car and said they had to go get parts. Coselman entered the Mercury, and Fred drove away. The older woman (Flanagan) stayed with the Chevette.

Fred's testimony continued: Defendant directed Fred to take the first off-ramp from the freeway. As they came down the ramp, defendant told Coselman he was going to rob her. Coselman gave defendant everything she had, including her glasses. At defendant's direction, Fred drove into a citrus grove and stopped. Defendant, Sheila, and Coselman got out, but Fred stayed in the car, as defendant ordered. Defendant bound Coselman's wrists and tied her to a palm tree. Sheila went through Coselman's purse. Defendant returned to the car and said he wanted Fred to go back with him to get Flanagan. Fred refused, but Sheila went with defendant. While they were gone, Fred untied Coselman and tried to persuade her to go with him for help, but she refused for fear that defendant would harm Flanagan.

Fred further testified: When defendant returned, he berated Fred for untying Coselman and ordered Fred to return to the car. En route, Fred looked back to see that defendant had retied Coselman's hands and was walking her into the grove. Fred followed, and defendant again ordered him back to the car. On his way back, Fred heard a single scream, rushed toward the sound, and saw defendant standing over the prostrate Coselman, pulling on a rope around her neck. Again defendant yelled at Fred to return to the car. When Fred arrived there, defendant was right behind him. Defendant and Sheila then took Flanagan from the car. They each held one of Flanagan's arms and began walking her into the grove. Fred followed, and defendant again ordered him to go back. Fred ran to Coselman, shook her body, and got no response. He then ran to the car and left to get help.[2]

In a police interview, defendant stated the following: Defendant, Fred, and Sheila stopped by the side of the freeway to help the women with the

---

[2]Fred's testimony at the 1979 guilt trial was to the same effect. (See *Anderson I, supra,* 43 Cal.3d 1104, 1116-1117.)

disabled Chevette, but neither defendant nor Fred could determine the problem. It was decided that Fred would take Coselman to a phone booth to call for help. Fred and Sheila left with Coselman, while defendant stayed with Flanagan and the Chevette. Sometime later, Fred and Sheila returned without Coselman. Fred told Flanagan that Coselman was at a phone booth, but was concerned about Flanagan remaining alone with the Chevette, so Fred would take Flanagan to meet Coselman. Fred and Sheila then left with Flanagan. Defendant remained with the Chevette. Soon Fred and Sheila returned alone, and defendant never saw Coselman or Flanagan again. Fred, Sheila, and defendant resumed their freeway trip, but Fred soon left the highway at an off-ramp, "got some kind of attitude[,] kicked [defendant and Sheila] out of the car and split."

The shoes worn by Fred, Sheila, and defendant on March 4, 1979, were examined for comparison with footprints found at the scene of the murders. The soleprints of defendant's and Sheila's shoes were similar to footprints found around Flanagan's body, but Fred's shoes could not have made any of the footprints found at that location.

Deborah Baros visited defendant in the Indio jail within days after his March 1979 arrest. He asked her to go to the orange grove and retrieve, from under a particular rock, a black purse that contained belongings.[3] Baros asked defendant, "Did you do it?" He nodded slightly.

Through cross-examination of Fred, and by other witnesses, the defense sought to expose inconsistencies in the details of the story Fred told at various times. The defense strategy was to suggest that Fred had falsely accused defendant, or exaggerated defendant's involvement in the crimes, in order to minimize Fred's own role.

B. *1978 murder of Jack Mackey.*

Deborah Baros testified as follows: In approximately March and April of 1978, she, defendant, and their young child Anthony were living in a boardinghouse at 1204 Helen Street in North Las Vegas, Nevada. Baros worked as a waitress at Mom's Kitchen, a soul food restaurant. When she worked evenings, her shift ended at 11:00 or 11:30 p.m. One evening, defendant picked Baros up from work, as was customary, in their brown Camaro. They drove to the service station where they usually bought gas. Anthony was between them in the front seat. After the attendant serviced the car, defendant asked for two packs of Kool cigarettes, his usual brand. Defendant followed the attendant to the center booth, where the cigarettes

---

[3]Donna Coselman's purse has never been found.

were kept. After a short time, the two returned to the passenger side of the car. Defendant then ordered the attendant to get into the Camaro. As the attendant entered the backseat, Baros saw that defendant was holding a gun shaped like an "L."

Baros continued: They left the station, made several turns, and drove toward the mountains. They passed a power plant, then stopped in a desert-like area with sand, gravel, dirt, and rocks. The night sky was well illuminated with "lights coming from somewhere." There was a chain link fence and "a bunch of jeeps" in the background. The weather was cool and breezy. Defendant ordered Baros and the attendant from the car. Baros and the attendant began walking, side by side, into the desert-like area. As they did so, Baros heard three or four shots. When she woke up, defendant was gone. Baros realized she was not hurt, but the attendant lay beside her, facedown, with blood on his back. After a couple of minutes, the Camaro returned. Defendant and Anthony were in the car. Defendant ordered Baros to get in, and she complied. They did not return to 1204 Helen Street, but went immediately to a motel "across the street from the old ice plant," where they stayed for several days. During that time, Baros continued to work at Mom's Kitchen. Then she, defendant, and Anthony went to Florida.

Baros identified photographs of the station and of Jack Mackey as the murdered attendant.

North Las Vegas police officers and other witnesses testified about the unsolved murder of Mackey. In 1978, Margaret Potter and her husband owned a Discount Oil station on Bonanza Road in Las Vegas. Early on the morning of April 20, 1978, police called Potter to the station because it was "wide open" and unattended. When Potter arrived, cigarettes normally kept in the central booth were strewn on the ground outside the booth, and Mackey, the attendant, was missing.

Around 9:00 a.m. on April 21, 1978, a cold and windy day, Mackey's body was discovered on the outskirts of North Las Vegas, in the 2800 block of North Commerce, which was then a largely undeveloped desert area. The site is not far from a power plant, and mountains to the east and north are prominent landmarks. Though there was little nearby lighting in 1978, the area would have received some indirect nighttime illumination from the glow of downtown Las Vegas.

When found, Mackey's body was faceup, about 20 or 30 feet from the street. Nearby, a chain link fence enclosed an adjacent construction or

trucking yard in which vehicles were parked.[4] Shell casings, expended slugs, and live rounds were found at various locations near and under the body. Examination of the body disclosed five bullet wounds, including shots to Mackey's head, back, and abdomen.

The Mackey murder remained unsolved in 1990. Riverside County investigators contacted Baros, whose name was in their files, seeking background information for the instant penalty retrial. Baros was interviewed in early 1990 at her New Hampshire home, then brought to Las Vegas to discuss and recreate the Mackey episode. Without prompting, Baros directed an officer and investigator to Mom's Kitchen and the Discount Oil station, then past a power plant and toward the mountains to the 2800 block of North Commerce, and finally to 1204 Helen Street. She also took them to an old ice plant and described the adjacent motel where she and defendant had stayed after the Mackey murder. Though there was no motel meeting her description in 1990, several had existed in April 1978.

On cross-examination of Baros, defense counsel elicited the following: Anthony was born in a Florida hospital in July 1974. In May 1978, a month after the Mackey slaying, Baros, defendant, and Anthony were living in West Memphis, Arkansas, across the river from Memphis, Tennessee. One rainy evening, while Baros and Anthony were passengers in a car driven by defendant, they had a traffic accident on the bridge between the two cities. Anthony was killed. When Baros awoke in the hospital, she learned she had given birth to triplets. Two of the triplets, Otto Lynn and Richard Lee, died within days. The third, Julia Eva, lived five months. All were buried in West Memphis. Baros herself remained in the hospital for four months. Baros remembered things through dreams and believed defendant could communicate with her by telepathy.

Testimony by defense and prosecution investigators established that inquiries to hospitals, cemeteries, health departments, and law enforcement agencies in Florida, Tennessee, and Arkansas, based on names variously used by Baros and information provided by her, had produced no record or other evidence of the births, deaths, or burials of Anthony or the triplets, or a May 1978 traffic accident involving Baros, or her hospitalization during that period. Myrtle Askew, who in 1978 owned the boardinghouse at 1204 Helen Street in North Las Vegas, confirmed that defendant and Baros lived in the house during the spring of that year, but Askew insisted that no child was with them, and that Baros never mentioned or showed signs she was pregnant during that time.

---

[4]After examining with a magnifying glass a 1978 crime-scene photo facing toward the adjacent construction yard, an officer testified that one of the objects in the photo "could be the front end of [a] small truck or a Jeep."

## DISCUSSION

### A. *Jury selection issues.*

#### 1. *Motion to quash petit jury panel.*

On August 31, 1990, less than one month before the penalty retrial was then scheduled to begin, defendant moved to quash the petit jury panel on grounds that, in violation of constitutional guarantees of equal protection and a fair trial, the panel failed to represent a fair cross-section of the community. Attached to the motion was the declaration of Dr. Edgar W. Butler, who stated that his 1988 study of superior court jury venires in the Indio/Palm Springs area indicated significant underrepresentation by several groups, including Blacks. At the same time, defendant moved to continue the trial on grounds that new studies of Indio/Palm Springs venires, using not-yet-published 1990 census data, were needed.

The trial court heard the motion to quash on September 14, 1990. Dr. Butler testified as follows: During an eight-week period in October, November, and December 1987, he conducted a comparative ethnic and demographic survey of persons who appeared at the Indio/Palm Springs courthouse in response to superior court jury summons. 1980 census data indicated that Blacks constituted 3.2 percent of the population of the geographic area from which Indio/Palm Springs juries were drawn. After reviewing preliminary data from the 1990 census, he expected that the new census would show no substantial change in this percentage. Moreover, the master list from which Indio/Palm Springs jurors were summoned at random in 1987—a list generated by merging voter registration and Department of Motor Vehicle (DMV) lists—appeared to fairly parallel the raw census figures for particular groups.[5] However, only 2.1 percent of the persons who actually appeared for jury duty at the Indio/Palm Springs courthouse during the survey period were Black. This represented an "absolute disparity" of 1.1 percent from the census figures and a "comparative disparity" of 34 percent.[6]

Dr. Butler opined that the disparity arose because, for reasons about which he could only speculate, some persons summoned for jury duty were not

---

[5]Dr. Butler explained that the master jury list does not directly catalog persons by race or ethnicity. However, when he compared the number of Spanish-surnamed persons on the master list with the raw census data for Hispanics, he found a rough agreement. He therefore assumed the master list was fairly representative of other groups as well.

[6]"Absolute disparity" is the difference between the underrepresented group's percentage in the jury-eligible population and the group's percentage in the actual jury venire. (See *People v. Bell* (1989) 49 Cal.3d 502, 527, fn. 14 [262 Cal.Rptr. 1, 778 P.2d 129] (*Bell*).) Thus, if Blacks are 3.2 percent of the eligible population, but only 2.1 percent of the actual venire, the absolute disparity is 3.2 percent minus 2.1 percent, or 1.1 percent. "Comparative disparity" measures the *percentage* by which the number of group members in the actual venire falls short of the number of group members one would expect from the overall "eligible

responding. In arriving at this opinion, Dr. Butler had considered testimony by the Riverside County Jury Commissioner in another case indicating that, in 1987, the commissioner's representative in the Indio/Palm Springs area "was not carrying out . . . follow-up procedures" to obtain the appearance of persons who failed to respond to the summons. On cross-examination, Dr. Butler explained his understanding that while there was no follow-up of summons returned to the court as nondeliverable, persons who simply failed to respond received two follow-up mailings before they were dropped from the jury rolls.

Testimony was also received from Robert Gulley, the supervisor of jury services for the Indio/Palm Springs area. Gulley testified as follows: Jurors were summoned at random from the master list, derived from voter registration and DMV registration records. Only about 10 percent of the persons summoned appeared. If a person failed to respond to the initial summons, another summons was sent in the same manner. If the person still failed to respond, a notice was sent by certified mail. By September 1990, work had begun on implementing a bench warrant system for those who did not respond to the certified notice, but the system was not yet operational. Gulley, who assumed his duties after 1987, had no knowledge whether such a program had begun by then. To Gulley's knowledge, nobody from the court system had ever gone into the field to find and bring in nonresponding persons.

On September 17, 1990, the court denied the motion to quash. The court ruled that defendant had failed in two respects to demonstrate a case of constitutional underrepresentation. First, the court determined, the disparity shown—that, of 32 Blacks who should appear for every 1,000 panelists, only 21 do—was not so great as to render the representation of Blacks on Indio/Palm Springs superior court juries less than fair and reasonable in relation to their number in the general population. Second, the court explained, defendant had failed to show, beyond Dr. Butler's speculation unsupported by any study of the subject, that the cause of the disparity was the failure of jury officials to conduct greater follow-up of persons who failed to respond to the random jury summons.

The next day, September 18, 1990, the trial court heard defendant's motion to continue the trial pending further study of the underrepresentation

---

population" figures. Thus, if 32 of every 1,000 members of the presumptively eligible population are Black, but only 21 of every 1,000 persons who actually make up the venire are Black, the comparative disparity is the percentage by which 21 falls short of 32, or approximately 34.4 percent. (See *People v. Sanders* (1990) 51 Cal.3d 471, 492 & fn. 5 [273 Cal.Rptr. 537, 797 P.2d 561] (*Sanders*).)

issue. Defendant's counsel abandoned any attempt to argue for delay until final 1990 census figures were available. However, counsel urged that perhaps it was the "appropriate time" to study further whether jury selection procedures, in particular the limited follow-up of those who failed to respond to summons, were the cause of the disparity. Counsel suggested such a study could probably be completed "in a couple of months." The trial court denied the motion, pointing out that it had already found the disparity was not mathematically unreasonable.

■ Defendant argues the trial court erred under the Sixth and Fourteenth Amendments by denying the motion to quash. ■ "Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren* v. *Missouri* (1979) 439 U.S. 357, 358-367 [58 L.Ed.2d 579, 583-588, 99 S.Ct. 664]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 842 [268 Cal.Rptr. 802, 789 P.2d 983].) 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the, community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' (*Duren* v. *Missouri, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at pp. 586-587]; *People* v. *Howard, supra,* 1 Cal.4th at p. 1159.) . . . If a defendant establishes a prima facie case of systematic underrepresentation, the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire. (*People* v. *Sanders*[, *supra*,] 51 Cal.3d 471, 491. . . .)" (*People v. Horton* (1995) 11 Cal.4th 1068, 1087-1088 [47 Cal.Rptr.2d 516, 906 P.2d 478] (*Horton*).)

"As to the third element of the *Duren* test, a defendant does not meet the burden of demonstrating that the underrepresentation was due to systematic exclusion, by establishing only statistical evidence of a disparity. A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process. (*People* v. *Howard, supra,* 1 Cal.4th [1132,] 1160; *People* v. *Bell*[, *supra*,] 49 Cal.3d 502, 530 . . . .) When a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, the defendant must identify some aspect of *the manner in which those criteria are applied* (the probable cause of the disparity) that is

constitutionally impermissible. (*People* v. *Sanders, supra,* 51 Cal.3d [471,] 492; *People* v. *Bell, supra,* 49 Cal.3d at p. 524.)" (*Horton, supra,* 11 Cal.4th 1068, 1088, italics in original.)

■ No party disputes that Blacks are a distinctive group in the community for purposes of *Duren* analysis, and that the first prong of *Duren* is therefore satisfied.[7] Defendant focuses his argument on the second prong of *Duren,* the issue of significant statistical disparity. Defendant contends at length that under "comparative disparity" analysis, the disparity he demonstrated (34 percent) was significant, and that the "absolute disparity" mode of analysis (yielding only a 1.1 percent disparity in his case) is unfair where, as here, the underrepresented group is but a small fraction of the overall population.

" '[T]he [United States] Supreme Court has not yet spoken definitively on either the means by which disparity may be measured or the constitutional limit of permissible disparity.' (*Bell, supra,* 49 Cal.3d [502,] 527-528.)" (*Sanders, supra,* 51 Cal.3d 471, 492.) However, here, as in *Bell* (Blacks constituted 8 percent of Contra Costa County population, but only 3 percent of prospective jurors, yielding absolute disparity of 5 percent and comparative disparity of 62.5 percent) and *Sanders* (adult Hispanic citizens constituted 16.3 percent of Kern County population, but only 8.3 percent of those appearing for jury duty, yielding absolute disparity of 8 percent and comparative disparity of 49 percent), we need not resolve the issue, because, as the trial court ruled, defendant failed to establish a prima facie case under *Duren*'s third prong by showing that the disparity was caused by the systematic exclusion of Blacks from Indio/Palm Springs juries.

In *Horton, supra,* 11 Cal.4th 1068, the same expert witness, Dr. Butler, identified a disparity between the percentages of Blacks and Hispanics who served on Norwalk jury venires and the percentages of presumptively eligible such persons living within a 20-mile radius of the Norwalk courthouse. As here, the master list, compiled from voter and DMV lists, was not underrepresentative, and there was no evidence that the process of summoning jurors from the master list was improperly selective. As here, Dr. Butler could only speculate that the large number of nonresponders might tip disproportionately toward minority populations, and that the conceded lack of follow-up on nonresponders might account for the underrepresentation on the venires.

---

[7]In his trial court pleadings, and again on appeal, defendant has made reference to possible underrepresentation of other allegedly distinctive groups on Indio/Palm Springs jury venires, including Hispanics, the young, and the poor. However, defendant's motion to quash was argued solely on the basis of Black underrepresentation, and, without objection by defendant, the trial court focused exclusively on that group in making its ruling. We do so as well.

The *Horton* trial court denied the motion to quash, reasoning that the selection process was race neutral, and that Dr. Butler's speculation about the cause of the underrepresentation was insufficient to satisfy the third prong of *Duren*. (*Horton*, *supra*, 11 Cal.4th 1068, 1089.) We agreed that this finding was supported by the record, in that "there was an insufficient showing that any discrepancy in the jury pool was attributable to 'systematic exclusion'—because the procedures .employed by the jury commissioner were, on their face, race-neutral, and the opinion of Dr. Butler as to the cause of any disparity was not supported by empirical evidence, but, rather, amounted to no more than speculation. [Citation.]" (*Id.*, at p. 1090; see also *Bell*, *supra*, 49 Cal.3d 502, 528-531 [where master list is representative, speculation that hardship deferrals weeded out minorities is insufficient to establish systematic exclusion; such systematic exclusion also cannot be shown solely by a consistent pattern of underrepresentation].) We reach the same result here.

We also find no abuse of discretion in the trial court's refusal to continue the trial pending defendant's further study of local jury procedures. The court below based its ruling on its determination, as a matter of law, that defendant had failed to demonstrate a significant disparity, an issue we do not decide. Nonetheless, the court's denial of a continuance was amply justified under all the circumstances. Defendant's challenge to the jury venire, and his motion to continue the trial for that purpose, were presented a scarce month before trial was scheduled to begin. At least since our *Bell* decision, announced almost a full year earlier, it had been clear that a *Duren* challenge required the defendant to prove specific, constitutionally impermissible jury selection procedures that were the systematic cause of any disparity, and that speculation on these matters would not suffice. Defendant's belated request for further delay to explore this issue, based solely on Dr. Butler's unsupported speculation that it might be the cause of the discrepancy, was properly rejected.

### 2. *Prosecution's peremptory excusal of Prospective Juror Nadyne T.*

■ The prosecutor exercised a peremptory challenge against Prospective Juror Nadyne T., who was Black. Defendant concedes that by failing to raise a timely objection in the trial court that the excusal was improperly founded on Ms. T.'s race (see, e.g., *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]), he waived such a direct claim on appeal. (E.g., *People v. Bolin* (1998) 18 Cal.4th 297, 316 [75 Cal.Rptr.2d 412, 956 P.2d 374] (*Bolin*); *People v. Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277] (*Montiel*).) However, defendant urges that

his counsel was ineffective for failing to object, and that the dismissal of Nadyne T. violated his Sixth and Fourteenth Amendment rights.[8]

■ To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. (E.g., *People v. Staten* (2000) 24 Cal.4th 434, 450-451 [101 Cal.Rptr.2d 213, 11 P.3d 968] *(Staten)*; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 [233 Cal.Rptr. 404, 729 P.2d 839] *(Ledesma)*.) When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. *(People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] *(Pope)*.) Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, " ' "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " *(Staten, supra,* at p. 451, quoting *Ledesma, supra,* 43 Cal.3d 171, 217-218; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674].)

■ Here, the record affords no basis for concluding that counsel's omission was not based on an informed tactical choice. Counsel may have felt the prosecutor could provide genuine race-neutral reasons for the excusal. (See *Bolin, supra,* 18 Cal.4th 297, 317.) Ms. T., then 76 years old, insisted she had no scruples for or against the death penalty and felt duty-bound to follow instructions despite her personal feelings, but her deep religious convictions led to the belief, derived from the Bible, that everyone should be forgiven "70 times seven times." This could give the prosecutor sincere pause about her ability to impose the punishment of death. Moreover, though Ms. T. professed excellent health, the prosecutor could have been concerned about her ability to withstand the effort and stress of a protracted capital penalty trial.

The possibility also arises that defense counsel himself preferred to dispense with this prospective juror. (See *Bolin, supra,* 18 Cal.4th 297, 317.) Aside from her age and endurance, her disclosure that she had given little thought to the death penalty, and her dogged adherence to her belief that the court's instructions must prevail over any personal feelings, could cause apprehension that she would not be receptive to untethered defense arguments for mercy and leniency. "Since the decision may well have been 'an

---

[8]Defendant notes that of those members of the venire who were summoned at random to his courtroom, Nadyne T., at the time of her excusal, was the sole remaining Black prospective juror after several others had been excused for cause or by stipulation.

informed tactical choice within the range of reasonable competence, the conviction must be affirmed. [Citation.]'" (*Bolin, supra*, 18 Cal.4th 297, 317, quoting *Pope, supra*, 23 Cal.3d 412, 425.)

B. *Trial issues.*

1. *Evidence of 1978 Mackey murder.*

As noted above, the People introduced evidence that defendant had engaged in violent criminal conduct other than the capital crimes, i.e., the murder of Mackey. (See Pen. Code, § 190.3, factor (b) [defendant's other violent criminal activity as aggravating factor].) Defendant had never been charged with or convicted of killing Mackey. Hence, before allowing the jury to hear this evidence, the trial court ruled on its legal sufficiency, as requested by defendant. (See *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423] (*Phillips*).) For this purpose, the court conducted an evidentiary hearing outside the jury's presence. (See Evid. Code, § 402.) The hearing, which took place over three court days, centered on the testimonial competence of Deborah Baros, who claimed she was an eyewitness to the Mackey murder and provided the sole evidence linking defendant to the crime.

At the hearing, the court heard essentially the same witnesses and evidence on the Mackey incident as were later presented to the jury. As before the jury, defense counsel cross-examined Baros at length about her memory of the Mackey episode. The hearing also included a full examination of Baros's beliefs about Anthony, the accident, and the triplets, including her assertion that Anthony was actually present when Mackey was killed. Defendant presented extensive evidence, similar to that later heard by the jury, suggesting that Anthony and the triplets were imaginary. Baros also disclosed, as before the jury, that she remembered many events through dreams and believed defendant could communicate with her by telepathy. Finally, Baros revealed in the hearing that she had suffered emotional problems in 1987 and 1988, when her children Dawn and Alan were taken away because of alleged sexual abuse. Baros admitted that as a result of these problems, she had seen therapists, was diagnosed with "emotional anguish," had taken prescription medications for the condition, and was still taking some medications (Premarin, Tylenol with codeine, and Fioricet) at the time of trial.[9]

In ruling on the matter, the trial court explained it could exclude Baros's testimony as incompetent only if it found that mental derangement or defect

---

[9]This evidence of Baros's therapy, diagnosis, and medication was not presented to the jury. When defense counsel asked Baros, while cross-examining her before the jury, if she had ever been in therapy, the court sustained the prosecutor's relevancy objection. Counsel did not pursue the matter. Defendant's resulting claims of prejudicial error and ineffective assistance of counsel are discussed below.

had deprived Baros of the *ability* to accurately perceive, recollect, or recount the events to which she would testify, while the issue whether she *did* so perceive, recollect, or communicate was for the jury. The evidence adduced at the hearing satisfied the court that Anthony and the triplets had never existed. The court also perceived a need for great caution in qualifying a witness whose delusions bore a material connection to the subject of her testimony.

Nonetheless, the court concluded, Baros had given a coherent account, many details of which were corroborated by independent evidence and would not likely be known by one who was not present. These included Baros's descriptions of the location from which Mackey was taken, the stolen cigarettes, the weapon used, the murder scene, and the multiple shots fired. Also significant was Baros's ability, after 11 years, to take investigators to the isolated site of the homicide. These factors, the court indicated, could lead a rational trier of fact to conclude beyond a reasonable doubt that Baros must have witnessed the kidnapping and murder of Mackey. Accordingly, the court ruled, Baros would be allowed to testify, and her testimony was legally sufficient evidence that defendant murdered Mackey.

Defendant raises numerous challenges regarding Baros's testimony.

a. *Determination of Baros's competence to testify.*

■ Defendant first urges that because Baros's delusions invaded the particular events about which she was to testify (Baros insisted her imaginary son Anthony was present at the murder of Mackey), she lacked the capacity to perceive and recollect those events accurately, and was thus incompetent to testify. The trial court's erroneous decision to allow Baros's testimony, he asserts, violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, and a reliable penalty determination.

Under pre-1965 statutes, all persons were qualified to testify who could "perceive[] and . . . make known their perceptions to others" (Code Civ. Proc., former § 1879, enacted 1872 and repealed by Stats. 1965, ch. 299, § 62, p. 1361), except that persons "of unsound mind" (*id.*, former § 1880, subd. 1, enacted 1872 and repealed by Stats. 1965, ch. 299, § 63, p. 1361) and young children who appeared incapable of perceiving pertinent events justly or relating them truthfully (*id.*, former § 1880, subd. 2, enacted 1872 and repealed by Stats. 1965, ch. 299, § 63, p. 1361) could not be witnesses.

Under this scheme, both the ability to perceive and the ability to communicate understandably and truthfully were necessary attributes of a qualified witness.

On the other hand, despite the statutory reference to persons "of unsound mind" (Code Civ. Proc., former § 1880, subd. 1), insanity was not an absolute bar to testimonial qualification. In such cases, "[t]he question to be determined [was] whether the proposed witness's mental derangement or defect [was] such that he was deprived of the *ability* to perceive the event about which he [was] to testify or [was] deprived of the *ability* to recollect and communicate with reference thereto. [Citations.] . . . Whether he did perceive accurately, [did] recollect, or [was] communicating accurately and truthfully [were] questions of credibility to be resolved by the trier of fact." (*People v. McCaughan* (1957) 49 Cal.2d 409, 420 [317 P.2d 974] (*McCaughan*), italics added.)

Under this system, a challenged witness's *capacities* to perceive, recollect, and communicate truthfully were all preliminary facts to be determined exclusively by the court in the exercise of its sound discretion. (See *McCaughan, supra,* 49 Cal.2d 409, 421.) "It follow[ed] that if the proposed witness was suffering from some insane delusion or other mental defect that deprived him of the ability to perceive the event about which it [was] proposed that he testify, he [was] incompetent to testify about that event." (*Ibid.*) Thus, while a committed mental patient was not necessarily disqualified from testifying about events inside the institution, sound discretion required the court to "exercise . . . great caution in qualifying as competent a witness who [had] a history of insane delusions relating to the very subject of inquiry in a case in which the question [was] not simply whether or not an act was done but, rather, the manner in which it was done and in which testimony as to details [might] mean the difference between conviction and acquittal." (*Ibid.*)

The prior rules governing the determination of testimonial competence were "modified" by the Evidence Code, adopted in 1965. (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 701, p. 284.) The effect "may [be to] permit . . . persons suffering from mental impairment to testify in some instances where they [were previously] disqualified from testifying." (*Id.,* at pp. 284-285.)

Under the current system, as before, every person is qualified to testify except as provided by statute. (Evid. Code, § 700.) A person is *disqualified* as a witness *only* if he or she is "[i]ncapable of *expressing* himself or herself [understandably] concerning the [testimonial] matter" (*id.,* § 701, subd.

(a)(1), italics added), or is "[i]ncapable of *understanding the duty of a witness to tell the truth*" (*id.*, § 701, subd. (a)(2), italics added; Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid. Code, *supra*, foll. § 701, p. 284; see *People v. Ayala* (2000) 23 Cal.4th 225, 265 [96 Cal.Rptr.2d 682, 1 P.3d 3] (*Ayala*); *People v. Cudjo* (1993) 6 Cal.4th 585, 621-622 [25 Cal.Rptr.2d 390, 863 P.2d 635] (*Cudjo*); *People v. Mincey* (1992) 2 Cal.4th 408, 444 [6 Cal.Rptr.2d 822, 827 P.2d 388]). Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. (Evid. Code, § 405, subd. (a); Assem. Com. on Judiciary, reprinted at 29B pt. 1 West's Ann. Evid. Code, *supra*, foll. § 405, p. 375; Assem. Com. on Judiciary com., reprinted at 29B pt. 2 West's Ann. Evid. Code, *supra*, foll. § 701, p. 284; see *Cudjo, supra*; *Mincey, supra*; *Adamson v. Department of Social Services* (1988) 207 Cal.App.3d 14, 20 [254 Cal.Rptr. 667]; *People v. Blagg* (1970) 10 Cal.App.3d 1035, 1039 [89 Cal.Rptr. 446] (*Blagg*).)

Even if a witness is not entirely disqualified for incapacity to communicate or to understand the duty to testify truthfully, his or her testimony on a *particular matter* (other than expert opinion testimony) is inadmissible "unless [the witness] has *personal knowledge* of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter." (Evid. Code, § 702, subd. (a), italics added.) The testimony must be excluded unless "there is evidence *sufficient to sustain a finding*" that the witness has such personal knowledge. (*Id.*, § 403, subd. (a)(2), italics added.)

Under the Evidence Code, the capacity to perceive and recollect particular events is subsumed within the issue of personal knowledge, and is thus determined "in a different manner" from the capacity to communicate or to understand the duty of truth. (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid. Code, *supra*, foll. § 701, p. 284; see *People v. St. Andrew* (1980) 101 Cal.App.3d 450, 458, fn. 3 [161 Cal.Rptr. 634].) "Because a witness, qualified under [Evidence Code] [s]ection 701, must have personal knowledge of the facts to which he testifies ([Evidence Code] [s]ection 702), he must, of course, have the capacity to perceive and to recollect those facts. But the court may exclude the testimony of a witness for lack of personal knowledge *only if no jury could reasonably find* that he has such knowledge. [Citation.] Thus, the Evidence Code has made a person's capacity to perceive and to recollect a condition for the admission of his testimony concerning a particular matter instead of a condition of his competency to be a witness. And, under the Evidence Code, *if there is*

*evidence that the witness has those capacities*, the determination whether he in fact perceived and does recollect is left to the trier of fact. [Citation.]" (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid. Code, *supra*, foll. § 701 at p. 284, italics added; see *Blagg*, *supra*, 10 Cal.App.3d 1035, 1039.)

Here, there is no serious claim that Baros was disqualified under Evidence Code section 701 because she could not communicate her memories coherently or understand she must recount them truthfully. Nor is there significant evidence she lacked those abilities. Rather, defendant contends that Baros's testimony about specific events, the alleged 1978 robbery and murder of Mackey, must be excluded because Baros lacked the capacity to perceive and recollect them accurately. This incapacity, defendant asserts, is demonstrated by Baros's delusions, including her insistence that her imaginary son Anthony was actually present during the 1978 episode.

As noted above, a witness must be allowed to testify unless he or she (1) cannot communicate intelligibly, (2) cannot understand the duty of truthful testimony, or (3) lacks personal knowledge of the events to be recounted. But while the first two questions are determined entirely by the court, its role with respect to the issue of personal knowledge is more limited. A witness challenged for lack of personal knowledge *must* nonetheless be allowed to testify *if there is evidence from which a rational trier of fact could find* that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible. (See *People v. Dennis* (1998) 17 Cal.4th 468, 525-526 [71 Cal.Rptr.2d 680, 950 P.2d 1035] *(Dennis)*.)

Here the trial court noted the many indicia by which a rational trier of fact could conclude that Baros, despite her specific delusions, was actually present during the Mackey robbery and murder, and had accurately perceived and recollected those events. Aside from her insistence that her son Anthony was present, Baros presented a plausible account of the circumstances of Mackey's murder. (Cf. *People v. Lyons* (1992) 10 Cal.App.4th 837, 842-844 [13 Cal.Rptr.2d 112] [alleged rape victim's belief that defendant had penetrated a "third orifice" located between her vagina and her anus, and had murdered her two husbands, one by blowing up his airplane, demonstrated incompetent lack of ability to distinguish truth from fantasy].) Baros's description included many details, unlikely to be known by a person not present, that were corroborated by independent evidence. Moreover, as the trial court emphasized, Baros was able, after a long absence from Las Vegas, to direct authorities to the significant locations involved in the crime. Under these circumstances, the trial court correctly allowed Baros to testify,

and to permit the jury to determine from all the relevant evidence whether her perceptions and memories were true.

In her jury testimony, Baros described Anthony's presence during the Mackey murder, the traffic accident in which Anthony was killed, and the birth and death of the triplets. Extensive evidence that Anthony, the accident, and the triplets were imaginary was presented to the jury. The jury also heard Baros's disclosures that she relived events through dreams and believed defendant had telepathic powers. It therefore had ample basis upon which to judge the reliability of Baros's observations. No error occurred.

### b. *Failure to order psychiatric examination of Baros.*

Defendant next contends that in view of Baros's delusional state, the trial court erred prejudicially by failing to require, sua sponte, that Baros undergo a psychiatric examination to assist the court's own evaluation of her testimonial competence. Defendant cites no authority, and we know of none, that imposes such a duty in the absence of request.

As defendant notes, earlier cases indicated a trial court should grant a defense motion for a psychiatric examination of the complaining witness in a sex-crime case where psychiatric evidence appeared necessary to assist the trier of fact in assessing the witness's *credibility*. (E.g., *People v. Russel* (1968) 69 Cal.2d 187, 193 [70 Cal.Rptr. 210, 443 P.2d 794]; *Ballard v. Superior Court* (1966) 64 Cal.2d 159, 171-177 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416] (*Ballard*) [noting, however, the general rule against impeachment by psychiatric evidence]; *People v. Duncan* (1981) 115 Cal.App.3d 418, 426-427 [171 Cal.Rptr. 406] [finding no abuse of discretion in denial of defense motion].) But the Legislature overruled this line of authority in 1980 by adopting Penal Code section 1112, which forbids courts from ordering psychiatric examinations of victims or complaining witnesses in sex-crime cases in order to assess their credibility.[10] We have recently reiterated that "[t]he use of psychiatric testimony to impeach a witness is generally disfavored." (*People v. Marshall* (1996) 13 Cal.4th 799, 835 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; see also *Ayala, supra,* 23 Cal.4th 225, 263; *People v. Alcala* (1992) 4 Cal.4th 742, 781 [15 Cal.Rptr.2d 432, 842 P.2d 1192] (*Alcala*).)

Defendant insists these principles do not preclude court-ordered psychiatric examinations to evaluate testimonial *competency*, a preliminary issue not

---

[10]In its current form, section 1112 provides: "Notwithstanding the provisions of subdivision (d) of Section 28 of Article I of the California Constitution, the trial court shall not order any prosecuting witness, complaining witness, or any other witness, or victim in any sexual assault prosecution to submit to a psychiatric or psychological examination for the purpose of assessing his or her credibility."

determined by the trier of fact. (See, e.g., *People v. Reber* (1986) 177 Cal.App.3d 523, 534 [223 Cal.Rptr. 139] (*Reber*), disapproved on other grounds by *People v. Hammon* (1997) 15 Cal.4th 1117, 1123 [65 Cal.Rptr.2d 1, 938 P.2d 986] (*Hammon*); *People v. Armbruster* (1985) 163 Cal.App.3d 660, 663 & fn. 1 [210 Cal.Rptr. 11].) But we see no convincing reason why a trial court must, on its own motion, order and consider the psychiatric evaluation of a potential witness whose testimonial competence is challenged on grounds of mental or emotional impairment. We recently intimated that trial courts have broad discretion to refuse requested examinations for this purpose (*Ayala, supra,* 23 Cal.4th 225, 264-265), and such a rule is well justified.

At the outset, serious privacy interests, as well as the policy of encouraging witnesses to come forward and testify voluntarily, would be undermined if courts were compelled to order psychiatric evaluations of potential witnesses as a condition of their testimony. Moreover, *Ballard* itself noted the many "dangers" of using psychiatric evidence to impeach credibility; "the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify issues; the testimony may be distracting, time-consuming and costly. . . ." (*Ballard, supra,* 64 Cal.2d 159, 175, fn. 10, citation omitted; see also *Alcala, supra,* 4 Cal.4th 742, 781.) Many, if not all, of these concerns are also pertinent to a court determination of competence. (See *Alcala, supra,* at pp. 780-782 [unavailability of witness on grounds of amnesia].)

Finally, as noted above, the grounds upon which a trial court may disqualify a witness as incompetent, or exclude the witness's testimony for lack of personal knowledge, are exceptionally narrow. The witness must be allowed to testify unless he or she cannot communicate intelligibly or understand the duty to tell the truth, or unless no rational jury could believe the witness actually saw the events he or she claims to have seen. In many cases, psychiatric testimony, itself "inherently [subject to] expert debate" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1247 [275 Cal.Rptr. 729, 800 P.2d 1159]), would be less useful on these issues than the court's own evaluation of the witness's demeanor and responses in light of all the evidence. (See, e.g., *Alcala, supra,* 4 Cal.4th 742, 781.)

Here, the extensive record of the competence hearing manifestly discloses that Baros was a coherent communicator, and her understanding of the

specific duty to give truthful testimony was also not in serious dispute or doubt. Thus, there seems little basis on which a psychiatric evaluation could have affected a ruling on her qualifications as a competent court witness. (See *Ayala, supra,* 23 Cal.4th 225, 265.)

On the issue whether Baros's specific testimony would reflect her personal knowledge, the court was fully aware of Baros's delusions about Anthony and the triplets, and the relationship of these fantasies to the events about which she would testify. The court also knew Baros had undergone therapy and taken medications for emotional problems. Yet the court believed, with substantial reason, that Baros's account of the Mackey murder, corroborated in numerous details by independent evidence, could persuade a rational jury she must actually have perceived that event. Again, this was not a matter on which psychiatric evidence would be of particular help. The court committed no error by failing, sua sponte, to order a psychiatric evaluation of Baros's qualifications to testify.[11]

---

[11]For the most part, defendant insists he claims the right to a sua sponte court-ordered psychiatric evaluation only with respect to Baros's testimonial *competence,* a court issue, not her *credibility,* a jury issue. However, he supports his argument with cases discussing whether the constitutional right to confront witnesses includes a right to explore subjects and discover materials, including mental health evidence, that might prove useful for impeachment. (See, e.g., *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 [107 S.Ct. 989, 94 L.Ed.2d 40] *(Ritchie); Reber, supra,* 177 Cal.App.3d 523; cf. *Davis v. Alaska* (1974) 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347] *(Davis).*) Defendant also suggests his Sixth and Fourteenth Amendment rights of due process, confrontation, and fair trial were "implicated" when the delusional Baros was allowed to testify against him in the guise of a competent witness even though the jury lacked "full information," including psychiatric evidence, about her mental condition.

We are unpersuaded. Due process may require the *state* to disclose exculpatory evidence, including psychiatric records of a witness, when such material is *already in the state's possession* and is not made absolutely privileged by state law. (*Ritchie, supra,* 480 U.S. 39, 57-58 [107 S.Ct. 989, 1001]; see also *People v. Webb* (1993) 6 Cal.4th 494, 518 [24 Cal.Rptr.2d 779, 862 P.2d 779].) But the high court has never held that the confrontation clause requires more than the opportunity to *ask the witness* questions pertinent to his or her credibility. (See *Ritchie, supra,* at pp. 51-54 [107 S.Ct. at pp. 998-999] (opn. of Powell, J.); but see *id.,* at pp. 61-65 [107 S.Ct. at pp. 1003-1005] (conc. opn. of Blackmun, J.); *id.,* at pp. 66-72 [107 S.Ct. at pp. 1006-1009] (dis. opn. of Brennan, J.); *Davis, supra,* 415 U.S. 308, 315-321 [94 S.Ct. 1105, 1109, 1112].) Several California decisions had concluded that, upon a showing of good cause, and after consideration of the competing interest in confidentiality, the confrontation clause might give a defendant the right to pretrial discovery, from nonparties, of a witness's otherwise privileged psychiatric records already in existence. (E.g., *People v. Dancer* (1996) 45 Cal.App.4th 1677, 1691 [53 Cal.Rptr.2d 282]; *Reber, supra,* 177 Cal.App.3d 523, 528-532.) However, we later disapproved this line of authority, holding that the confrontation clause gives no right to pretrial discovery that would override a statutory or constitutional privilege. (*Hammon, supra,* 15 Cal.4th 1117, 1122-1128.)

No case has remotely held that the confrontation clause, or any other constitutional guarantee, could compel a witness to undergo a new court-ordered psychiatric examination, or impose on the trial court a sua sponte duty to order such an examination. Indeed, the federal decisions have suggested that the power to condition a witness's testimony on submission to

### c. *Counsel's failure to request psychiatric examination of Baros.*

■ Defendant urges alternatively that his trial counsel rendered constitutionally ineffective assistance by failing to request a psychiatric evaluation of Baros. However, given the considerations weighing against widespread use of court-ordered psychiatric examinations to determine testimonial qualifications (see text discussion, *ante*), we cannot say on this record there was no reasonable basis for counsel's failure to request one. In any event, defendant fails to show prejudice from the omission.

In the first place, the appellate record does not indicate whether a new psychiatric examination would have supported defendant's claim that Baros should not be allowed to testify about the murder of Mackey. (See, e.g., *People v. Medina* (1995) 11 Cal.4th 694, 773-774 [47 Cal.Rptr.2d 165, 906 P.2d 2] [appellate claim of ineffective assistance cannot be based on speculation about available evidence].) Moreover, for reasons already stated, it appears highly unlikely any psychiatric testimony would have altered the trial court's ruling on the narrow issues before it. As noted above, the court knew of Baros's delusions and emotional problems, but Baros communicated clearly and gave a plausible account of the murder, many details of which were corroborated by independent evidence. On that basis, the court deemed itself compelled to allow the jury to judge her credibility. The claim of ineffective assistance must therefore be rejected.

### d. *Denial of cross-examination re Baros's therapy.*

■ Defendant contends error occurred when, during the defense cross-examination of Baros before the jury, the court sustained the prosecutor's relevancy objection to counsel's question whether Baros had ever been in therapy. (See fn. 9, *ante*.) By cutting off this line of inquiry, defendant insists, the court deprived the jury of crucial information about her mental condition as it bore on her credibility. According to defendant, this evidence included the information, disclosed by Baros in the competence hearing, that the authorities had recently taken away her children on suspicion of sexual abuse; that these events resulted in emotional problems, psychiatric therapy, and a diagnosis of "mental anguish"; and that she was taking medications for her emotional condition.

Defendant asserts the court's ruling violated the requirement that all relevant evidence be admitted (Cal. Const., art. I, § 28, subd. (d)) as well as

a psychiatric evaluation should be used sparingly. (See, e.g., *U.S. v. Ramirez* (6th Cir. 1989) 871 F.2d 582, 585, & cases cited.) Here, as we have already observed, both the court and the jury knew of Baros's fantasies about imaginary children, and both had ample other evidence from which to judge whether, notwithstanding these delusions, Baros's testimony about the Mackey murder was an accurate account of actual events.

his rights to due process, a fair trial, confrontation of witnesses, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendant also claims his counsel provided ineffective assistance by failing to pursue the matter after the initial objection was sustained.

The contention lacks merit. Defendant fails to demonstrate the relevance of the excluded information to Baros's credibility about the Mackey murder. It is a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions. "A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem." (*People v. Pack* (1988) 201 Cal.App.3d 679, 686 [248 Cal.Rptr. 240].) Even if examination of a witness about treatment for mental illness might sometimes be relevant, here evidence that Baros had received therapy would have added little to the specific evidence, largely undisputed, that she had significant fantasies. Defense counsel was allowed to cross-examine Baros fully about the specific delusions that might impair the accuracy of her testimony. Nothing more was necessary. Hence, the trial court acted properly in sustaining a relevancy objection when defense counsel asked Baros whether she had ever been in therapy. For similar reasons, counsel was not ineffective for dropping the matter after the initial objection was sustained.

e. *Marital privilege of Bruce Baros.*

On the morning of December 18, 1990, just before Deborah Baros (Deborah) was to testify concerning her qualifications as a witness to the Mackey murder, defense counsel suggested that Bruce Baros (Bruce), Deborah's current husband, should be excluded from the courtroom as a potential witness. Counsel explained that Bruce had been present when Deborah was interviewed by two defense investigators the previous year, and that, if given the opportunity, the defense "may well" call Bruce to impeach Deborah on details of the interview. Counsel disclosed that the idea of calling Bruce had arisen only because Bruce had come to the trial with Deborah from their New Hampshire home, and counsel conceded he could use the interviewing investigators themselves for impeachment. Over counsel's indignant disagreement, the prosecutor objected that counsel was claiming Bruce as a potential witness only to deny Deborah the supportive presence of Bruce during her testimony.

Concerned about the marital privilege, and about the potential loss of courtroom support for Deborah, the court appointed counsel to confer with Bruce. The court then asked Bruce on voir dire whether he would invoke a

spousal privilege if called to testify. Bruce replied that, based on his counsel's advice, he would do so, because he did not want to testify against his wife.

After further argument, the trial court ruled in limine that if Bruce was called solely to impeach Deborah, and if Bruce invoked a marital privilege, the court would uphold the privilege under Evidence Code section 970. The court explained that this statute gives a witness the privilege not to testify "against" a spouse, that the policy is to avoid marital discord, that the privilege may be overcome by fair-trial concerns, but that the balance favors the privilege where the witness is called only to impeach the spouse, and other witnesses (here, the defense investigators) are available for that purpose. Accordingly, the court determined, Bruce would not be excluded from the courtroom as a potential witness.

However, the court agreed that if the defense later decided to call Bruce, the court should be notified out of the jury's presence, whereupon, if Bruce claimed the privilege, counsel could preserve the record by obtaining a ruling and entering a formal objection at that time. The defense did not thereafter attempt to call Bruce.

■ Defendant now argues the trial court's evidentiary ruling was error, because Evidence Code section 970 only gives a witness the privilege "not to testify *against* his spouse in any proceeding." (Italics added.) Defendant urges that one does not testify "against" a spouse when called only to impeach the spouse in a proceeding where the spouse is not a party. If Evidence Code section 970 does apply in this situation, defendant insists, it violates his "constitutional rights to due process of law, fair trial, confrontation and cross-examination and equal protection."

However, we need not address the merits of these arguments, because defendant failed to preserve the issue for appeal. In general, a judgment may not be reversed for the erroneous exclusion of evidence unless "the substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a); see, e.g., *People v. Pride* (1992) 3 Cal.4th 195, 235 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Livaditis* (1992) 2 Cal.4th 759, 778 [9 Cal.Rptr.2d 72, 831 P.2d 297] (*Livaditis*); *People v. Whitt* (1990) 51 Cal.3d 620, 648 [274 Cal.Rptr. 252, 798 P.2d 849] (*Whitt*); see also *Staten, supra*, 24 Cal.4th 434, 456.) This rule is necessary because, among other things, the reviewing court must know the substance of the excluded evidence in order to assess prejudice. (See *Whitt, supra*, 51 Cal.3d 620; cf. *People v. Collins* (1986) 42 Cal.3d 378, 383-385 [228 Cal.Rptr. 899, 722

P.2d 173] [defendant may not challenge ruling that prior crime will be admitted for impeachment unless he takes the stand and suffers the impeachment].)

Here, counsel explained *why* Bruce might be called, i.e., to impeach Deborah concerning her interview with defense investigators, but counsel did not offer to show *what* material impeachment Bruce might provide. Counsel then dropped the matter and never actually called Bruce to the stand.

This was insufficient. Even if an offer of proof was impractical in advance of Deborah's testimony, it could have been made after Deborah had testified. Nor would it have been futile for defendant to call Bruce and make an offer of proof. (Evid. Code, § 354, subd. (b).) In its in limine ruling, the trial court acknowledged that fair-trial concerns might outweigh the privilege, and the court expressly agreed to a mechanism by which defendant could later call the witness, have the privilege invoked, and obtain a ruling.

Under these circumstances, defendant failed to make a record that permits a finding he was prejudiced by the loss of Bruce's testimony. Indeed, such prejudice appears unlikely, because Francis Leaman and Charles Small, the defense investigators who interviewed Deborah in Bruce's presence, both testified about the interview at the hearing concerning Deborah's compe- tence, and Leaman gave testimony on that subject before the jury. Defendant demonstrates no basis for reversal.

### f. *CALJIC No. 2.01.*

██ Defendant contends the trial court erred by refusing both parties' request that the jury be instructed under CALJIC No. 2.01, discussing the treatment of circumstantial evidence. This standard instruction provides, among other things, that a finding of "guilt as to any crime" cannot be based on circumstantial evidence unless the proved circumstances both (1) are consistent with the defendant's "guilt," and (2) cannot be reconciled with any other rational conclusion. (*Ibid.*) The instruction further states that if the circumstantial evidence permits two reasonable interpretations, one suggesting the defendant's "innocence" and the other his "guilt," the jury must adopt the interpretation suggesting innocence.[12] Defendant insists the error affected the jury's consideration of the Mackey murder evidence, in violation of his rights to due process, equal protection, fair trial, and a

---

[12]CALJIC No. 2.01 provides that "a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of

reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Of course, evidence of the Mackey murder was not introduced to prove defendant's "guilt" of a charged crime, but to demonstrate, as a circumstance in aggravation of the capital murders, that he had engaged in other violent criminal conduct. (§ 190.3, factor (b).) We may assume that similar restrictions on the use of circumstantial evidence apply in such a case. However, we have consistently held that CALJIC No. 2.01 is not necessary unless the prosecution substantially relies on circumstantial evidence to prove its case. (E.g., *People v. Marquez* (1992) 1 Cal.4th 553, 577 [3 Cal.Rptr.2d 710, 822 P.2d 418]; *People v. Wright* (1990) 52 Cal.3d 367, 406 [276 Cal.Rptr. 731, 802 P.2d 221] (*Wright*); *People v. Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881]; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].) Indeed, where circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given. (*Wright, supra*; *Wiley, supra*; *People v. Gould* (1960) 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865].)

Here, as the trial court noted, the People relied primarily upon direct evidence, i.e., the eyewitness testimony of Deborah Baros, to prove that defendant committed the Mackey murder. Defendant suggests that "aside from Baros's testimony, *all* the Mackey evidence against [defendant] is circumstantial." But by introducing circumstantial evidence merely to corroborate an eyewitness, the prosecution did not substantially rely on such evidence. The court's refusal to give CALJIC No. 2.01 was correct.

g. *CALJIC No. 2.24.*

■■■ The jury received a number of instructions about witness credibility, including CALJIC Nos. 2.13 (witness's prior consistent or inconsistent statement may be considered for both credibility and truth) and 2.21.2 (witness willfully false on material point should be distrusted on others) and a modified version of CALJIC No. 2.20. This latter instruction advised that

---

circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence . . . permits two reasonable interpretations, one of which points to the defendant's guilt and the other to [his] [her] innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to [his] [her] guilt. [¶] If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

when evaluating a witness's believability, the jury could consider anything with a tendency in reason to prove or disprove the truthfulness of the witness's testimony, specifically including the witness's ability to perceive, remember, or communicate any testimonial event; the character and quality of the witness's testimony; the witness's demeanor; whether the witness had any bias, interest, or motive to lie; and any admission of untruthfulness by the witness.

However, with the agreement of both counsel, the trial court omitted from CALJIC No. 2.20 any reference to "[t]he character of the witness for honesty or truthfulness or their opposites." Neither party requested, and the court did not give, CALJIC No. 2.24, which provides that "[e]vidence of the character of a witness for honesty or truthfulness may be considered in determining [his] [her] believability."

Defendant insists the trial court erred by failing to give CALJIC No. 2.24 sua sponte. This instruction was necessary, he urges, because of Deborah's mental instability, as well as her admission that she had given inaccurate details about the Mackey episode when first approached by investigators. Defendant also points to indications that Fred, the eyewitness to the capital crimes, had speech and hearing impediments and low intelligence, exhibited confusion and lack of comprehension on the witness stand, and harbored an obvious motive to protect himself and his sister Sheila. Defendant claims violations of his rights to due process, equal protection, fair trial, and sentence reliability under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

No error occurred because, as both counsel agreed in the trial court, no evidence was presented that either Deborah or Fred lacked the character traits of honesty or truthfulness. (Evid. Code, § 780, subd. (e); see *People v. Morris* (1991) 53 Cal.3d 152, 213, fn. 15 [279 Cal.Rptr. 720, 807 P.2d 949].) Other issues related to the credibility of the testimony offered by Deborah and Fred were amply covered by instructions the court did give. As noted, these instructions pointed out that jurors could consider witnesses' demeanor; the plausibility of their testimony; their apparent ability to perceive and recollect; their inconsistencies and falsehoods; their bias, interest, or motive to lie; and any other matters with reasonable bearing on the believability of their testimony. Defendant's contention lacks merit.

 h. *Sufficiency of evidence.*

Finally, because there was no error in allowing Deborah to testify as a competent witness, we must reject defendant's contention that the

evidence he murdered Mackey was insufficient to permit the jury to consider this unadjudicated crime as an aggravating penalty factor. (*Phillips, supra*, 41 Cal.3d 29, 72, fn. 25.) Testifying as an eyewitness, Deborah identified defendant as Mackey's killer. She provided details about the murder that were corroborated by independent evidence, and she was able to direct authorities to the crime scene. There was clearly sufficient evidence to permit jury consideration of this unadjudicated offense.

### 2. *Contentions regarding section 190.3, factor (b).*

Evidence that defendant murdered Jack Mackey was presented at defendant's penalty retrial pursuant to section 190.3, factor (b) (factor (b)), which allows a capital sentencer to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence." ▪▪▪ Factor (b) refers to violent conduct other than the capital crime (*Montiel, supra*, 5 Cal.4th 877, 938; *People v. Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480] (*Balderas*)), and it allows proof of such other violent acts committed at any time, regardless of whether they led to criminal charges or convictions (§ 190.3; *People v. Hart* (1999) 20 Cal.4th 546, 648-649 [85 Cal.Rptr.2d 132, 976 P.2d 683] (*Hart*); *Balderas, supra*, at pp. 201-202), except acts for which the defendant was acquitted (§ 190.3; *Balderas, supra*, at p. 201, fn. 28). However, the proffered violence must constitute an actual crime (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 148 [2 Cal.Rptr.2d 335, 820 P.2d 559] (*Bacigalupo*); *Phillips, supra*, 41 Cal.3d 29, 65-72), and the court must instruct, on its own motion, that no juror may consider any alleged other violent crime in aggravation of penalty unless satisfied beyond a reasonable doubt that the defendant committed it (e.g., *People v. Champion* (1995) 9 Cal.4th 879, 949 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People v. Miranda* (1987) 44 Cal.3d 57, 97 [241 Cal.Rptr. 594, 744 P.2d 1127] (*Miranda*); *People v. Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279]). Defendant attacks this scheme in numerous respects, both facially and as applied to his case.

### a. *Admission of unadjudicated violent crime.*

Defendant first urges that insofar as it allowed his capital sentencer to consider the Mackey murder, a crime for which he was never charged and convicted, factor (b) violates rights of due process, fair trial, and a reliable penalty determination guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments. As defendant concedes, we have rejected such contentions in many cases. (E.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1054 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1178 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Samayoa* (1997) 15

Cal.4th 795, 863 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People v. Cain* (1995) 10 Cal.4th 1, 69-70 [40 Cal.Rptr.2d 481, 892 P.2d 1224] *(Cain)*; *People v. Medina* (1990) 51 Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282]; *Balderas, supra*, 41 Cal.3d 144, 204-205.) We decline to reconsider them here.

b. *Staleness.*

■■■ Defendant urges the 1978 Mackey murder was too remote in time from his 1990-1991 penalty retrial and should have been excluded on that ground. According to defendant, admission of this "stale" criminal episode on the issue of penalty violated his constitutional rights of due process, fair and speedy jury trial, confrontation, and a reliable penalty determination.

The contention lacks merit. Under factor (b), the prosecutor may offer evidence in aggravation of criminal violence that has occurred at any time. *(People v. Rodrigues* (1994) 8 Cal.4th 1060, 1158 [36 Cal.Rptr.2d 235, 885 P.2d 1] *(Rodrigues)*; *People v. Heishman* (1988) 45 Cal.3d 147, 192 [246 Cal.Rptr. 673, 753 P.2d 629]; *Balderas, supra*, 41 Cal.3d 144, 202.) This rule does not violate the constitutional guarantee of a speedy trial. *(Rodrigues, supra*, at p. 1161.) " '[T]he state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in determining the appropriate penalty, so long as reasonable steps are taken to assure a fair and impartial penalty trial. [Citation.] Remoteness of the offense affects the weight, not admissibility, of the offense. [Citation.]' " *(People v. Medina, supra*, 11 Cal.4th 694, 772, quoting *Rodrigues, supra*, at p. 1161; see also *People v. Anderson* (1990) 52 Cal.3d 453, 476 [276 Cal.Rptr. 356, 801 P.2d 1107].)

Defendant concedes these principles, but asserts that a 12½-year gap is too extreme as a matter of law. He is mistaken. (See, e.g., *Rodrigues, supra*, 8 Cal.4th 1060, 1160-1161 [12-year-old crime not too remote]; *People v. Anderson, supra*, 52 Cal.3d 453, 476 [14-year-old crime not too remote].)[13]

Moreover, defendant identifies no basis for suspecting that the delay unfairly prejudiced his ability to mount a defense to the Mackey homicide. He complains about the mental state of the primary prosecution witness,

---

[13]Defendant's argument is further undermined by the fact that the Mackey murder occurred within a year of the capital crimes themselves. The delay between the Mackey episode and the second penalty trial resulted in large part from defendant's success in overturning the prior death judgment on appeal. The jury was entitled to an accurate picture of defendant's violent criminality near the time of his 1979 arrest and subsequent uninterrupted incarceration for the murders of Donna Coselman and Louise Flanagan. (See *People v. Anderson, supra*, 52 Cal.3d 453, 476; *People v. Frank* (1990) 51 Cal.3d 718, 729 [274 Cal.Rptr. 372, 798 P.2d 1215].)

Deborah, and observes that there were no defense witnesses, but he points to no evidence that the passage of time contributed to these concerns. Defendant notes that Deborah did not come forward until soon before the penalty retrial, but he fails to explain how this delay compromised his ability to confront her.

On the other hand, the prosecution presented a number of witnesses who testified extensively concerning the Mackey episode. Aside from Deborah, these witnesses included law enforcement officials whose memories of the Mackey case, often refreshed by reference to contemporaneous records of their homicide investigation, corroborated details of Deborah's testimony. Both Deborah and a police detective testified that within a year before the penalty retrial, Deborah directed investigators by memory to several locations pertinent to the Mackey episode, including the murder scene itself. Defendant was able to cross-examine all the prosecution witnesses at length.

The appellate record thus contains no inkling that defendant's rights to due process, a fair trial, and a reliable penalty determination were violated by the delay in presenting evidence that he murdered Mackey. His attack on the staleness of the Mackey murder must therefore be rejected.

 c. *Evidence Code section 352.*

■ Defendant urges that all evidence of the Mackey murder should have been excluded as more prejudicial than probative. (Evid. Code, § 352.) He concedes no such objection was made at his 1990-1991 penalty retrial, but he asserts the requirement of an objection was not then clear. On the contrary, the rule that a challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below stems from long-standing statutory and common law principles. (Evid. Code, § 353, subd. (a); see Assem. Com. on Judiciary com., reprinted at 29B pt. 1 West's Ann. Evid. Code, *supra,* foll. § 353, p. 322.) Defendant waived the issue by failing to object.

The contention lacks merit in any event. Factor (b) expressly makes a capital defendant's other violent crimes admissible on the issue of penalty. Evidence Code section 352 therefore does not permit the trial court to exclude from a capital penalty trial *all* evidence of such a crime on grounds that the jury's consideration of the episode would be more prejudicial than probative. (*People v. Box* (2000) 23 Cal.4th 1153, 1200-1201 [99 Cal.Rptr.2d 69, 5 P.3d 130] (*Box*); *People v. Ray* (1996) 13 Cal.4th 313, 349-350 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Robertson* (1989) 48 Cal.3d 18, 44 [255 Cal.Rptr. 631, 767 P.2d 1109]; *People v. Karis* (1988) 46 Cal.3d 612, 641 & fn. 21 [250 Cal.Rptr. 659, 758 P.2d 1189].)

Defendant implies that because the principal witness, Deborah, was delusional and unstable, evidence that defendant murdered Mackey was too *unreliable* to be admitted in light of its inflammatory nature. We have already rejected this premise in other contexts; we do so again here. Once Deborah was deemed qualified to testify, the prosecution was entitled, under factor (b), to present her account of this violent crime for the jury's evaluation. From that point on, the reliability of her testimony was a jury question, and went to the weight of the evidence, not its admissibility. No error appears.

For similar reasons, there is no merit to defendant's alternative contention that his trial counsel was ineffective for failing to object under Evidence Code section 352. Counsel is not required to proffer futile objections. (E.g., *People v. Hines* (1997) 15 Cal.4th 997, 1038, fn. 5 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

### d. *Failure to instruct on elements of unadjudicated violent crime.*

The jury was told there was evidence that defendant had committed the robbery and murder of Jack Mackey, that no juror could consider these criminal acts as aggravating factors unless satisfied beyond reasonable doubt that defendant committed them, and that the jury could consider no other criminal acts in aggravation. However, defendant's counsel requested no instructions on the specific elements of robbery and murder. When the failure to request murder instructions was called to counsel's attention in open court, counsel admitted he had not requested such instructions. Counsel further agreed that the court had no obligation to give them in the absence of request. A minute order recited that "[d]efendant specifically does not request instructions on [the] substantive law of other criminal acts evidence," and the jury did not receive such instructions.

Nonetheless, defendant now argues the trial court's failure to instruct, sua sponte, on the elements of the crimes the jury could consider in connection with the Mackey killing violated his due process and equal protection rights to proof beyond reasonable doubt of all elements of a charged crime, as guaranteed by the Fifth and Fourteenth Amendments, as well as his rights to a fair trial and a reliable penalty determination, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments. Defendant insists these rights could not be waived, but if waiver was possible, he alone, and not counsel, could waive them. If counsel's waiver was valid, he asserts, it constituted ineffective assistance.

We have repeatedly rejected just such arguments (e.g., *Hart, supra,* 20 Cal.4th 546, 651; *People v. Osband* (1996) 13 Cal.4th 622, 704 [55

Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Avena* (1996) 13 Cal.4th 394, 435 [53 Cal.Rptr.2d 301, 916 P.2d 1000] (*Avena*); *People v. Hawkins* (1995) 10 Cal.4th 920, 963-964 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *Cain, supra*, 10 Cal.4th 1, 72-74; *People v. Johnson* (1993) 6 Cal.4th 1, 48-49 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *Phillips, supra*, 41 Cal.3d 29, 72-73, fn. 25), and we do so again. As we have explained, the rule absolving the court of a sua sponte duty to instruct on the elements of crimes introduced under factor (b) " 'is based in part on a recognition that, as [a] tactical matter, the defendant "may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes because he may fear that such instructions could lead the jury to place undue emphasis on the crimes rather than on the central question of whether he should live or die." [Citations.]' " (*Hart, supra*, at p. 651, quoting *Cain, supra*, at p. 72.) This may be true even when other violent crimes are the only aggravating evidence other than the circumstances of the capital crimes themselves. (*Avena, supra*, at p. 435.) The court has no duty to "override" counsel's choice, though the court is not prohibited from giving "elements" instructions sua sponte where they are " ' "vital to a proper consideration of the evidence." [Citation.]' " (*Hart, supra*, at p. 651, quoting *Cain, supra*, at p. 72.)

Here, counsel's admission that he was not requesting elements instructions, and that they therefore need not be given, suggests he made the tactical choice to forgo them. We cannot say as a matter of law that his decision was unreasonable. Defendant had little to gain by such instructions, because the evidence raised no substantial doubt that defendant's conduct against Mackey, as described by Deborah, included the offenses of murder and robbery. Under these circumstances, counsel could reasonably wish to avoid focusing the sentencer's attention on the ample evidence that the elements of those offenses were satisfied. For similar reasons, such instructions were not vital to a proper consideration of the evidence on the issue of penalty.

Defendant analogizes to the rule that failure to instruct sua sponte on all the elements of a *charged offense*, thus relieving the prosecution of its burden to prove each such element beyond a reasonable doubt, is serious constitutional error. (See *People v. Flood* (1998) 18 Cal.4th 470, 479-480 [76 Cal.Rptr.2d 180, 957 P.2d 869].) The analogy is inapt. The defendant's history of criminal violence is relevant to the ultimate issue in a capital sentencing trial, but that issue is the appropriate penalty for the defendant's already-proven capital crimes, not whether the defendant committed the specific elements of additional criminal offenses.

■ The California capital sentencing scheme does require that violent conduct be criminal in fact in order to constitute valid penalty evidence. (See

authorities cited, *ante,* pp. 587-588.) Moreover, because evidence that the defendant committed other violent crimes "is often of 'overriding importance . . . to the jury's life-or-death determination,' " California law imposes a foundational requirement—one not mandated by the Constitution—that other-crimes evidence offered for this purpose be subject to the reasonable doubt standard of proof. (*Miranda, supra,* 44 Cal.3d 57, 98; see also *Avena, supra,* 13 Cal.4th 394, 429.) In other words, before a sentencing juror weighs the *culpable nature* of such other violent criminal conduct on the issue of penalty, he or she must be highly certain that the defendant committed it.

However, the ultimate question for the sentencer is simply whether the aggravating circumstances, as defined by California's death penalty law (§ 190.3), so substantially outweigh those in mitigation as to call for the penalty of death, rather than life without parole. (*People v. Brown* (1985) 40 Cal.3d 512, 541-542, fn. 13 [230 Cal.Rptr. 834, 726 P.2d 516].) In making this essentially normative determination, penalty jurors need not agree on the dispositive factors, or on the existence of any specific aggravating factor or crime, as a prerequisite to imposing the death penalty. (See, e.g., *Box, supra,* 23 Cal.4th 1153, 1216; *People v. Millwee* (1998) 18 Cal.4th 96, 166 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *Miranda, supra,* 44 Cal.3d 57, 99; *People v. Ghent* (1987) 43 Cal.3d 739, 773-774 [239 Cal.Rptr. 82, 739 P.2d 1250] (*Ghent*); *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113] (*Rodriguez*).) Conversely, the prosecution has no burden of proof that death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a judgment of death. (See *Box, supra*; *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

Indeed, we "would immerse the jurors in lengthy and complicated discussions of matters wholly collateral to the penalty determination" (*Ghent, supra,* 43 Cal.3d 739, 773) were we to require sua sponte instructions focusing on the elements of particular offenses that might be included in the defendant's violent criminal history. We therefore adhere to our rule that such instructions are not required in the absence of a request.[14]

---

[14]We are not persuaded otherwise by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435]. There, the United States Supreme Court found a constitutional requirement that any fact, other than a prior conviction, which increases the maximum penalty for a crime must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. (*Id.,* at pp. 476-490 [120 S.Ct. at pp. 2355-2363].) But under the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true

e. *Failure to require unanimous reasonable-doubt finding.*

 Defendant asserts the trial court erred by failing to instruct that jurors could not consider the unadjudicated Mackey murder in aggravation of penalty unless they unanimously found beyond a reasonable doubt that defendant committed it. The error, he contends, violated his rights to due process, equal protection, fair trial, trial by jury, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[15] We have consistently applied the rule that while an individual juror may consider violent "other crimes" in aggravation only if he or she deems them established beyond a reasonable doubt, the jury need not unanimously find other crimes true beyond a reasonable doubt before individual jurors may consider them. Unanimity is required only as to the appropriate penalty. (E.g., *Hart, supra,* 20 Cal.4th 546, 649; *People v. Stanley* (1995) 10 Cal.4th 764, 823 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *Livaditis, supra,* 2 Cal.4th 759, 785; *People v. Pinholster* (1992) 1 Cal.4th 865, 974 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *Bacigalupo, supra,* 1 Cal.4th 103, 135; *Miranda, supra,* 44 Cal.3d 57, 99; *Ghent, supra,* 43 Cal.3d 739, 773-774; *Rodriguez, supra,* 42 Cal.3d 730, 777-779.) Defendant presents no compelling reason to reconsider this long line of authority.

3. *Admission of photographs.*

The prosecution offered in evidence numerous photographs bearing on both the Coselman-Flanagan murders and the Mackey murder. The trial court set a time to consider all these exhibits at once. During a lengthy, free-flowing discussion among court and counsel, the court made individual rulings on each. Defense counsel enumerated several photos to which he had no objection, and those were admitted accordingly. As to the rest, it appears court and counsel assumed their admissibility was in dispute under Evidence Code section 352. With respect to certain of the disputed photos the court ultimately ruled admissible, defense counsel had made specific arguments why they should be excluded; in other instances, he had not.

At the outset, the court noted it would take particular care against cumulative or unduly gruesome photos because our opinion in *Anderson I, supra,*

_____

beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*

[15]Defendant did not request an instruction that the Mackey murder itself must unanimously be found true beyond a reasonable doubt. Defendant proffered, but then withdrew, an instruction that the jurors could not consider any "set of facts" in aggravation unless they unanimously found such facts true beyond a reasonable doubt.

43 Cal.3d 1104, had criticized admission of such exhibits at the guilt phase of the prior trial. The court did observe, and defense counsel conceded, that because the brutality of defendant's capital crimes was an aggravating circumstance relevant to the appropriate penalty, photos offered at the *penalty* phase to show the condition of the bodies, or to illustrate the brutal manner in which the victims were killed, were not inadmissible simply because the defense did not dispute the method by which death was inflicted.

The court admitted certain disputed crime-scene and autopsy photographs of the Coselman-Flanagan murders, ruling that they were not cumulative or excessively inflammatory, and that they demonstrated the manner of killing or corroborated the testimony of prosecution witness Fred, whose credibility was under heavy defense attack.[16] At the same time, the court declined to admit others of the disputed photographs on similar subjects, concluding that they were cumulative or unduly gruesome.

■ Defendant renews his argument that the Coselman-Flanagan crime scene and autopsy photos admitted over defense objection were more prejudicial than probative. He asserts their erroneous admission violated not only state law, but his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. The contention lacks merit.

■ When asked to exclude evidence as more prejudicial than probative (see Evid. Code, § 352), the trial court has broad discretion. Its ruling will not be disturbed on appeal unless the prejudicial effect of evidence so admitted clearly outweighed its probative value. (E.g., *Hart, supra,* 20 Cal.4th 546, 644; *People v. Ramos* (1997) 15 Cal.4th 1133, 1170 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

■ Indeed, a court has *narrower* discretion under Evidence Code section 352 to *exclude* photographic evidence of the capital crimes from *the penalty trial* than from the guilt trial. This is so for two reasons. On the one hand, because the "circumstances of the [capital] crime" are a statutorily relevant factor in the normative decision whether death is the appropriate penalty (§ 190.3, factor (a)), the prosecution is entitled at the penalty phase

---

[16]For example, the court noted that the several photos showing different views of distinctive bruises on Flanagan's and Coselman's arms, including "spot" bruises indicating the impressions of fingers, corroborated Fred's testimony that Sheila and defendant grasped each of the victims by both wrists to walk them to the sites where they were killed. Photos showing footprints or the soles of shoes at the crime scene were important in order to sort the killer's prints from others, such as those of the victims and Fred, that were either present at, or absent from, the areas where the bodies were found. These matters were important because defendant, asserting a penalty defense of lingering doubt, sought to show that Fred lied about events in the orange grove and that Fred, not defendant, might have been one of the actual killers.

to show such circumstances in a bad moral light, including their viciousness and brutality. On the other hand, because the defendant has already been found guilty of the capital crime, the potential for prejudice on the issue of guilt is not present. (*Staten, supra,* 24 Cal.4th 434, 463; *Box, supra,* 23 Cal.4th 1153, 1201.)

 Here, the challenged photos fairly depict the remote murder scene to which Coselman and Flanagan were taken to isolate them from help, the brutal manner of their killing, and the resulting effects on the victims. The admitted photos also illustrate physical and circumstantial evidence that was either expressly or impliedly at issue in the penalty trial. Nor were clearly cumulative photos admitted. Several of the exhibits, though superficially similar, provided different views necessary to provide a full understanding of the prosecution's theories. Moreover, photos are not cumulative simply because they illustrate evidence presented by other means. (*Box, supra,* 23 Cal.4th 1153, 1199; *People v. Crittenden* (1994) 9 Cal.4th 83, 134-135 [36 Cal.Rptr.2d 474, 885 P.2d 887] (*Crittenden*).)

Finally, the admitted photos are not unfairly gruesome. Several show the effects of brutal strangulation, but those effects are inherently unpleasant. Though certain of the admitted photos unavoidably show portions of the victims' faces, the court was careful to exclude the most graphic examples. Because the bodies were discovered promptly, the photos do not depict them in a state of decomposition. (See, e.g., *People v. Thompson* (1988) 45 Cal.3d 86, 116 [246 Cal.Rptr. 245, 753 P.2d 37].) In sum, the admitted photos are not offensive beyond the events and conditions they portray. Under the circumstances, their inclusion was clearly within the court's discretion. (Cf., e.g., *Hart, supra,* 20 Cal.4th 546, 644-647.)[17]

 Defendant also asserts that admission at the penalty retrial of photographic exhibits *admitted at the prior guilt trial* was error under the doctrine of law of the case, because our *Anderson I* opinion suggested that certain crime-scene photos were improperly admitted in the earlier proceeding. For multiple reasons, this contention must be rejected.

In the first place, defendant failed to preserve the issue for appeal. He did not object in the trial court on the ground now asserted. Though he now invites *our* elaborate hindsight examination of both records to .compare similarities and differences between photos admitted and excluded in the two

---

[17]Defendant raised no constitutional objections to the photos in the trial court, and such arguments are therefore waived on appeal. (E.g., *People v. Ramos, supra,* 15 Cal.4th 1133, 1170; *Crittenden, supra,* 9 Cal.4th 83, 135, fn. 10.) For the reasons stated above, we find them unpersuasive in any event.

trials, he did not make a record *below* that would have allowed the instant trial court to determine whether it might be endangering the judgment on appeal by admitting evidence in violation of a direct holding of *Anderson I*. Our *Anderson I* opinion itself did not identify the specific exhibits we deemed objectionable, referring only to "certain photographs of the bodies of the victims at the crime scene." (*Anderson I, supra,* 43 Cal.3d 1104, 1137.)

Of course, the trial court was well aware of *Anderson I*'s discussion of photographic exhibits; the court raised the matter with counsel sua sponte. Though *Anderson I* induced caution in the instant court's rulings, the court nonetheless implicitly assumed that *Anderson I* did not impose a categorical ban upon all crime-scene and autopsy photos at the penalty retrial. This assumption was correct.

In *Anderson I*, we simply expressed "serious doubt" whether "certain" crime-scene photographs should have been admitted *on the issue of guilt.* (*Anderson I, supra,* 43 Cal.3d 1104, 1137.) Some of the photos, we noted, "appear[ed] to go only to the issue whether a human being had been killed," a nonissue in the case. (*Ibid.*) We conceded that other photos, revealing how the victims were killed, were relevant, but observed they were largely cumulative of expert and lay testimony on that subject. (*Ibid.*) In any event, we made clear that any error was harmless, even on the issue of guilt, because the photos "[were] *not* unduly gruesome" (italics added), and the evidence of guilt was overwhelming. (*Ibid.*)

As noted above, the prosecution has wider latitude at the penalty phase to introduce illustrative evidence of the capital crime, because such evidence comes too late to prejudice the determination of guilt, and the brutal circumstances are relevant to the penalty determination. Thus, beyond confirming the essentially noninflammatory nature of the photos there at issue, *Anderson I*'s discussion of photographic evidence in the prior guilt trial has little relevance here. The photographs at issue in this penalty proceeding were properly admitted. Accordingly, the court did not abuse its discretion in further allowing the prosecutor to use enlarged versions of three of the photographs to illustrate his closing argument.

Finally, defendant objected to admission of exhibit No. 81, a photo of Jack Mackey, the 1978 Las Vegas murder victim, as Mackey appeared in life. Defendant argued that the photo was irrelevant because he had offered to stipulate to the victim's identity. Over defendant's objection on similar grounds, Jack Mackey's son gave brief testimony to the effect that exhibit No. 81 was a snapshot of the victim taken at Christmas of 1976 or 1977

(within a year and a half before the murder), and that it accurately showed the victim's appearance at that time. The son also stated that the victim's birthdate was April 3, 1928, making him 50 years old at the time of his death. The court later admitted exhibit No. 81 in evidence, accepting the prosecutor's argument that it bolstered the hotly contested credibility of Deborah—the alleged eyewitness to the Mackey murder—by corroborating her statement that the victim was a young-looking man.

As below, defendant urges that the admission of exhibit No. 81 contravened *People v. Bonin* (1989) 47 Cal.3d 808 [254 Cal.Rptr. 298, 765 P.2d 460]. There we found error at the *guilt* phase of a capital trial when parents of victims were allowed, before the jury, to identify photos of their murdered offspring in life and in death, even though the defense had offered to stipulate to the victims' identity, the admission of the photos, and the fact that each victim was alive before the alleged criminal act against him, and dead afterwards. (*Id.,* at pp. 848-849.)

*Bonin* is inapposite. As the instant trial court explained, exhibit No. 81 was relevant to an issue on which the defense had not offered to stipulate, i.e., the credibility of Deborah. Moreover, at the penalty phase of a capital case, a photograph of a murder victim while alive is relevant and admissible as a circumstance of the offense (see factor (b); *Box, supra,* 23 Cal.4th 1153, 1201 [acknowledging that prosecution, at penalty trial, may show moral blameworthiness of violent criminal activity other than capital crime]) because it portrays the victim as seen by the defendant before the murder. (*People v. Lucero* (2000) 23 Cal.4th 692, 714 [97 Cal.Rptr.2d 871, 3 P.3d 248] [victim of capital crime]; *People v. Cox* (1991) 53 Cal.3d 618, 688 [280 Cal.Rptr. 692, 809 P.2d 351] (*Cox*) [same].) There was nothing inflammatory about exhibit No. 81 that might unfairly influence jurors in deciding whether defendant committed the previously unadjudicated murder of Mackey (see *Box, supra*), and hence no prejudice in any event. No basis for reversal appears.

4. *Shackling.*

On October 4, 1990, the third day of trial, the court took up the issues of whether defendant should wear physical restraints during trial, and whether the court should conduct an in camera hearing on that subject. In open court, Sergeant Steger, the officer in charge of court security, testified that Indio jail officials had advised him of a possible plan for defendant's escape. Steger said this information came primarily from a confidential informant. Invoking the governmental privileges for official information and confidential informants (Evid. Code, §§ 1040, 1041), Steger declined to provide

further details in open court. Defense counsel objected to an in camera hearing.

The trial court initially ruled that Steger's testimony established a significant risk of flight, and that defendant should wear a leg brace under his trousers, but no other restraints. Defense counsel argued against the ruling. Upon inquiry by the court, counsel withdrew his opposition to an in camera hearing and joined the prosecutor's request that the matter be further explored by that means. The court vacated its initial ruling and agreed to the hearing.

An in camera hearing then ensued, from which defendant, his counsel, and the prosecutor were all absent. At the conclusion of the in camera hearing, the court sealed the record of that proceeding. Thereafter, in open session, the court found a manifest need for physical restraint and reinstated its order for a concealed leg brace.

■■■■ Defendant urges that the trial court erred prejudicially by ordering him to be physically restrained during trial sessions. He insists the evidence at the open hearing did not establish the requisite manifest need for restraints, and that the shackling order therefore violated his rights to due process, fair trial, and reliable penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments. He further contends that to the extent the court based its decision on the in camera proceeding, from which he and his counsel were excluded, he was denied his right to be present at every critical trial stage, as well as his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, fair trial, and reliable penalty. Finally, defendant asserts that his counsel's agreement to the secret hearing was compelled, and thus did not waive his objection, but that if counsel waived by agreeing, counsel rendered ineffective assistance.

■■■■ A criminal defendant cannot be physically restrained in the jury's presence unless there is a showing of manifest need for such restraints. (*People v. Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1] (*Duran*)). Such a showing, which must appear as a matter of record (*id.*, at p. 291), may be satisfied by evidence, for example, that the defendant plans to engage in violent or disruptive behavior in court, or that he plans to escape from the courtroom (*id.*, at pp. 292-293, fn. 11). A shackling decision must be based on facts, not mere rumor or innuendo. (*Cox, supra*, 53 Cal.3d 618, 651-652.)

■■■■ However, we need not determine whether the evidence adduced in this case, either in open court or in the in camera hearing, constituted a

sufficient showing of manifest need to shackle defendant. No basis for reversal appears in any event, because the record contains no hint that physical restraints impaired the fairness of defendant's trial and thus caused prejudice.

 As we explained in *Cox*, "[t]he rule in . . . *Duran* . . . seeks to avoid the pernicious effect of the 'possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system . . . , as well as the effect such restraints have upon a defendant's decision to take the stand . . . .' ([*Duran, supra,*] 16 Cal.3d at p. 290; see also *Illinois* v. *Allen* (1970) 397 U.S. 337, 344 [25 L.Ed.2d 353, 359, 90 S.Ct. 1057].) In assessing the impact on the right to a fair trial, the first and last of these considerations predominate." (*Cox, supra,* 53 Cal.3d 618, 652.)

Hence, in *Duran* itself, we found that improper shackling was among several errors causing cumulative prejudice when "[the] [d]efendant . . . elected to testify in his own behalf [and] was required to appear as a witness with both wrist and ankle restraints, thereby damaging his credibility . . . ." (*Duran, supra,* 16 Cal.3d 282, 296.) On the other hand, we have consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense. (E.g., *People v. Coddington* (2000) 23 Cal.4th 529, 650-651 [97 Cal.Rptr.2d 528, 2 P.3d 1081] (*Coddington*); *People v. Majors* (1998) 18 Cal.4th 385, 406 [75 Cal.Rptr.2d 684, 956 P.2d 1137]; *People v. Tuilaepa, supra,* 4 Cal.4th 569, 584; *Cox, supra,* 53 Cal.3d 618, 652-653; but see *People v. Hill* (1998) 17 Cal.4th 800, 846 [72 Cal.Rptr.2d 656, 952 P.2d 673] [cumulative error].)

 Such is the case here. Defendant did not testify at the penalty retrial, and there is no evidence or claim his restraints influenced him not to do so. Moreover, the court ordered that the only restraining device would be a leg brace concealed under defendant's trousers; there is no evidence or claim the jury ever saw the brace. Hence, we have no basis to find that prejudice arose.

This analysis also disposes of defendant's complaints about his exclusion from the in camera hearing. "Under the facts, we need not resolve the question of whether the presence of an accused at such a hearing 'bears a "reasonably substantial relation to the fullness of his opportunity to defend against the charge" [Citation.]' [Citation.] Any error in the court's decision was harmless and remains so irrespective of defendant's absence from some portion of the proceedings." (*Cox, supra,* 53 Cal.3d 618, 653.)

### 5. *Failure to request Keenan counsel.*

 Defendant urges that his counsel in the penalty retrial, Keith Long, acted incompetently by failing to request "full-fledged" second counsel to assist in all phases of the pretrial and trial proceedings. (*Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108]; see now § 987, subd. (d).)

As evidence that Long knew or should have known he needed such assistance, and that the omission was prejudicial, defendant cites the following: When the court appointed Long on October 21, 1988, it also appointed, at Long's request, Michael Kennedy to assist "in legal research and preparation of motions only." In July 1990, several months before trial, defendant wrote to the court complaining of Long's inattention to defendant's concerns that his housing situation, and his jailers, were impeding attorney-client communication, and asking the court to conduct a "status review" of progress in trial preparation. In August 1990, Kennedy wrote to the court requesting he be relieved, effective May 30, 1990, and reminding the court that on that earlier date, the court had agreed to relieve Kennedy in light of the latter's "anxieties about the . . . case." Also in August 1990, defendant again wrote to the court, seeking a *Marsden* hearing. (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) Defendant's letter stated that Kennedy had told him Kennedy resigned over concern about Long's competence, and that Dr. Whiting, the defense psychologist, had told him Long would not respond or give him directions.[18] Kennedy did not participate at trial, and the last document bearing Kennedy's name is dated March 29, 1990. Kennedy's sole billing, filed May 8, 1990, reflects only 59.5 hours of service. Long presented no evidence or case in mitigation.

Defendant also cites the length of the trial (which took place over 49 court days) and of the record (some 6,700 pages of reporter's transcript and some 1,180 pages of clerk's transcript) as indicia that the case was too complex for a single lawyer to handle effectively.

However, this record falls far short of a showing that Long was constitutionally inadequate for failing to request the full assistance of a second attorney. As in *People v. Webster* (1991) 54 Cal.3d 411, 437 [285 Cal.Rptr. 31, 814 P.2d 1273] (*Webster*), where a similar claim was made, fragmentary evidence of disagreements among the defense team, or between client and attorney, does not demonstrate that trial counsel required the help of a second lawyer. Such rifts, tensions, and professional differences are not uncommon in the course of preparing and trying a capital case. Moreover,

---

[18]Defendant later withdrew the *Marsden* request in open court.

trial length is not a reliable indicator that the case is too burdensome for a single trial counsel; indeed, it often reflects counsel's diligence. In this case, the absence of mitigating character and background evidence is troubling, but the appellate record affords no basis for concluding that the lapse was the result of Long's incompetent failure to obtain full trial assistance from another attorney.

Similarly, defendant identifies no record evidence, and we discern none, demonstrating a reasonable probability that counsel's mistake, if any, in failing to request full-time second counsel affected the trial outcome. (*Strickland v. Washington, supra*, 466 U.S. 668, 692-693 [104 S.Ct. 2052, 2067]; *Webster, supra*, 54 Cal.3d 411, 437.) Hence, the claim of ineffective assistance must be rejected.

### 6. *Failure to present mitigating evidence.*

Defendant asserts his trial counsel was ineffective because he failed to present any mitigating evidence of defendant's mental state, or other evidence that might have provided a basis for a sentence less than death. However, the appellate record does not disclose what mitigating evidence was available that was not presented, or what reasons defense counsel may have had for not presenting it. " 'On a silent record, as we have here, we will not assume that the defense counsel's failure to present mitigating evidence rendered his assistance ineffective. Any assertion that counsel was inadequate in this regard must be raised on habeas corpus.' " (*Cudjo, supra*, 6 Cal.4th 585, 634, quoting *People v. Diaz* (1992) 3 Cal.4th 495, 566 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; see *Webster, supra*, 54 Cal.3d 411, 437.)

### 7. *Instructions on aggravating and mitigating circumstances.*

With regard to the weighing of aggravating and mitigating factors to determine the appropriate penalty (§ 190.3), the court instructed the jury in the words of CALJIC No. 8.85, as modified, and CALJIC No. 8.88 (1989 rev.). The first mentioned instruction, in the form given, admonished the jury, among other things, (1) that it could consider, "as reasons for not imposing the death penalty," "any . . . circumstances relating to the case or the defendant," (2) that it specifically could consider, as a "mitigating circumstance," any lingering doubt about the defendant's guilt of the capital crime or the truth of any special circumstance, and (3) that "[a]ny one [such factor] may be sufficient, standing alone, to support a decision that death is not the appropriate punishment." Among other things, the latter instruction stated: "The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors . . . or the arbitrary assignment

of weights to any . . . . You are free to assign whatever moral or sympathetic value you deem appropriate to each . . . factor[] . . . . In weighing the various circumstances you determine . . . which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

 Defendant urges the trial court erred by refusing certain additional instructions. These include his proposed instructions Nos. 6 (jurors need not find any mitigating circumstances to return sentence of life imprisonment), 10 (factors must be weighed, not merely counted; one mitigating factor may support decision that death is not the appropriate punishment; weight of any factor is for individual juror to decide), 11 (jurors may assign whatever weight they deem appropriate to each factor; one mitigating circumstance may justify life without parole if it outweighs all aggravating factors; combined weight of factors, not their numbers, is determinative), 16 (jurors may reject death under the circumstances even if they believe aggravating factors predominate over mitigating), 26 (jurors must determine if death is the appropriate punishment notwithstanding that aggravating factors may outweigh mitigating), and 27 (no juror is required to vote for death unless, under weighing process, juror personally determines that death is the appropriate penalty under all the circumstances).[19]

The trial court properly rejected these proffered instructions as duplicative, redundant, and argumentative. The instructions actually given covered all the points emphasized by defendant, and did so in more neutral fashion. They specified (1) that determination of the appropriate penalty was not a mechanical counting process, but one of evaluating the moral weight of all the evidence, aggravating and mitigating, (2) that jurors could not impose death unless satisfied the comparative weight of aggravating over mitigating circumstances was "so substantial" as to warrant that penalty instead of life without parole, (3) that any one mitigating factor, standing alone, could support a finding of life without parole, rather than death, as the appropriate penalty, and (4) that to impose death, each juror must be personally persuaded the balance of aggravation over mitigation justified that punishment. No reasonable juror, so instructed, could infer the law favored the death penalty, made sentencing a mechanical or mathematical process, absolved

---

[19]Defendant also suggests it was error to refuse his proposed instruction No. 13 (jurors must not decide appropriate penalty by simply counting aggravating and mitigating factors, but must weigh varying circumstances; death may be imposed only where aggravating circumstances outweigh mitigating circumstances), but that instruction was withdrawn at trial.

jurors of personal responsibility to determine the appropriate penalty under all the circumstances, or authorized a judgment of death simply because the aggravating circumstances were marginally greater in number or weight than those in mitigation.

For these reasons, we have consistently held that instructions similar to those given in this case adequately explain the jury's sentencing responsibilities and are not impermissibly vague. (E.g., *Coddington, supra*, 23 Cal.4th 529, 642; *People v. Jackson* (1996) 13 Cal.4th 1164, 1242-1244 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Arias* (1996) 13 Cal.4th 92, 170-171 [51 Cal.Rptr.2d 770, 913 P.2d 980] (*Arias*); *Rodrigues, supra*, 8 Cal.4th 1060, 1192; *People v. Wader* (1993) 5 Cal.4th 610, 662-663 [20 Cal.Rptr.2d 788, 854 P.2d 80].) No more was required here.[20]

### 8. *Inapplicable sentencing factors.*

The trial court refused defendant's request to delete from the jury instructions certain statutory sentencing factors, as set forth in section 190.3, about which no evidence had been presented. These included factors (d) (extreme mental or emotional disturbance), (e) (victim participation or consent), (f) (defendant's belief in moral justification or extenuation), (g) (extreme duress), (h) (diminished mental capacity), and (i) (defendant's age). Defendant asserts the refusal denied him a reliable penalty determination, and was thus error under the Fifth, Eighth, and Fourteenth Amendments. We have repeatedly rejected such claims. (E.g., *Box, supra*, 23 Cal.4th 1153, 1217; *People v. Turner* (1994) 8 Cal.4th 137, 207-208 [32 Cal.Rptr.2d 762, 878 P.2d 521] (*Turner*); *People v. Clark* (1992) 3 Cal.4th 41, 169 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *Whitt, supra*, 51 Cal.3d 620, 653.) We do so again.

### 9. *Challenges to 1978 death penalty law.*

Though he concedes we have previously rejected such arguments, defendant contends that, in numerous respects, the 1978 death penalty scheme denies a reliable penalty determination in violation of the Fifth, Eighth, and Fourteenth Amendments. He is mistaken. As before, we conclude:

---

[20]In *People v. Duncan* (1991) 53 Cal.3d 955 [281 Cal.Rptr. 273, 810 P.2d 131], we made clear that under the 1978 death penalty law, the sentencer may, "even in the absence of mitigating evidence," determine that the aggravating evidence is insubstantial. (*Id.*, at p. 979.) Nonetheless, we have since consistently rejected arguments that the jury must expressly be told it may return a sentence of life without parole even if it finds *no* mitigating evidence. As we have explained, no reasonable juror, having heard the standard instructions given in this case, " 'would assume he or she was required to impose death despite insubstantial aggravating circumstances merely because no mitigating circumstances were found to exist.' " (*Rodrigues, supra*, 8 Cal.4th 1060, 1192, quoting *People v. Johnson, supra*, 6 Cal.4th 1, 52; also cf. *People v. Jones* (1998) 17 Cal.4th 279, 314 [70 Cal.Rptr.2d 793, 949 P.2d 890].)

The statute (§ 190.2) does not impose overbroad death eligibility, either because of the sheer number and scope of special circumstances which define a capital murder, or because the statute permits capital exposure for an unintentional felony murder. (E.g., *Box, supra,* 23 Cal.4th 1153, 1217; *People v. Ochoa* (1999) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442] *(Ochoa); People v. Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183] *(Frye); Crittenden, supra,* 9 Cal.4th 83, 154-156; *People v. Marshall* (1990) 50 Cal.3d 907, 946 [269 Cal.Rptr. 269, 790 P.2d 676]; *Anderson I, supra,* 43 Cal.3d 1104, 1138-1147.)

The sentencing factors set forth in section 190.3, particularly factors (a) (circumstances of the capital crime), (b) (other violent criminal activity), (c) (prior felony convictions), and (i) (defendant's age), are not impermissibly vague. (E.g., *Tuilaepa v. California* (1994) 512 U.S. 967, 975-980 [114 S.Ct. 2630, 2636-2639, 129 L.Ed.2d 750]; *Box, supra,* 23 Cal.4th 1153, 1217; *Turner, supra,* 8 Cal.4th 137, 207-208.)

Use in the sentencing factors of the phrases "*extreme* mental or emotional disturbance" (§ 190.3, factor (d), italics added) and "*extreme* duress or . . . *substantial* domination of another" (*id.,* factor (g), italics added) does not inhibit the consideration of mitigating evidence or make the factors impermissibly vague. (E.g., *Tuilaepa v. California, supra,* 512 U.S. 967, 976-977 [114 S.Ct. 2630, 2637]; *Box, supra,* 23 Cal.4th 1153, 1217; *People v. Davenport* (1995) 11 Cal.4th 1171, 1230 [47 Cal.Rptr.2d 800, 906 P.2d 1068] *(Davenport); Turner, supra,* 8 Cal.4th 137, 208-209.)

The statute is not invalid for failing to state which sentencing factors are aggravating and which are mitigating. (E.g., *Box, supra,* 23 Cal.4th 1153, 1217; *People v. Welch* (1999) 20 Cal.4th 701, 771-772 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *Davenport, supra,* 11 Cal.4th 1171, 1229; *Crittenden, supra,* 9 Cal.4th 83, 153; *Montiel, supra,* 5 Cal.4th 877, 943.)

The statute is not invalid for failing to require (1) written findings of dispositive aggravating factors, (2) proof of all aggravating factors beyond reasonable doubt, (3) findings that aggravation outweighs mitigation beyond reasonable doubt, or (4) findings that death is the appropriate penalty beyond reasonable doubt. (E.g., *Box, supra,* 23 Cal.4th 1153, 1217; *People v. Bemore* (2000) 22 Cal.4th 809, 859 [94 Cal.Rptr.2d 840, 996 P.2d 1152]; *Ochoa, supra,* 19 Cal.4th 353, 479; *Frye, supra,* 18 Cal.4th 894, 1029; *Crittenden, supra,* 9 Cal.4th 83, 153; *Livaditis, supra,* 2 Cal.4th 759, 785-786; *People v. Mickey* (1991) 54 Cal.3d 612, 701-702 [286 Cal.Rptr. 801, 818 P.2d 84]; *Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

Prosecutorial discretion to select those death-eligible cases in which the death penalty will actually be sought is not constitutionally impermissible.

(E.g., *Box, supra,* 23 Cal.4th 1153, 1217; *People v. Williams* (1997) 16 Cal.4th 153, 278 [66 Cal.Rptr.2d 123, 940 P.2d 710] (*Williams*); *People v. Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].)

### 10. *Proportionality review.*

■ Defendant argues that "[t]he lack of any requirement of intercase or intracase proportionality review and of any meaningful such undertaking in this case at the time of trial or on appeal violates appellant's Fourteenth Amendment right to equal protection—since such review is afforded non-capital inmates. (Pen. Code, § 1170[, subd.] (f).)" It is settled that *intercase* proportionality review is not required as a matter of due process, equal protection, fair trial, or cruel and/or unusual punishment concerns. (E.g., *Box, supra,* 23 Cal.4th 1153, 1217; *Ayala, supra,* 23 Cal.4th 225, 304; *Dennis, supra,* 17 Cal.4th 468, 552; *Williams, supra,* 16 Cal.4th 153, 279; *Avena, supra,* 13 Cal.4th 394, 447; *Arias, supra,* 13 Cal.4th 92, 192-193; see *Pulley v. Harris* (1984) 465 U.S. 37, 50-51 [104 S.Ct. 871, 879, 79 L.Ed.2d 29].)

Contrary to defendant's insinuation, the cruel or unusual punishment clause of the California Constitution (art. I, § 17) does entitle a capital defendant, on request, to *intracase* review *by this court* to determine whether the death penalty is grossly disproportionate to his personal culpability. (E.g., *Ayala, supra,* 23 Cal.4th 225, 304; *Ochoa, supra,* 19 Cal.4th 353, 478; *Williams, supra,* 16 Cal.4th 153, 279; *Arias, supra,* 13 Cal.4th 92, 193.) Assuming defendant's complaints constitute such a request, we find no basis to overturn the judgment of death. The evidence strongly implicated defendant in the brutal murders of three persons on two different occasions. In each case, he acted alone or as the clear leader of a criminal enterprise. Eyewitnesses identified him as the actual killer of two of these victims, Donna Coselman and Jack Mackey, on two separate occasions, and there was strong circumstantial evidence that he was also the actual killer of the third victim, Louise Flanagan. The motive for each homicide was robbery, and the means used—strangulation (Coselman), hanging (Flanagan), and multiple gunshots (Mackey)—indicate that each of the killings was intentional. The death penalty was not grossly disproportionate to defendant's crimes.

### 11. *Trial and appellate delay.*

■ Defendant urges that by virtue of the nearly three-year delay between our decision in *Anderson I* and the commencement of his penalty retrial, he was denied speedy-trial rights guaranteed by statute (§ 1382) and by the state and federal Constitutions (U.S. Const., Amend. VI, cl. 1; Cal.

Const., art. I, § 15, cl. 1). He also claims the long periods consumed by both appeals in his case, during which he has remained on death row awaiting execution, constitute violations of his rights to due process and against cruel and unusual punishment, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments. His contentions must fail.

As to the speedy-trial claims, the following facts are pertinent: Our *Anderson I* decision was announced on October 13, 1987 (*Anderson I, supra,* 43 Cal.3d 1104), and our remittitur issued on November 18, 1987. Thereafter, defendant first appeared in superior court on December 17, 1987, whereupon he personally waived time for commencement of the retrial, and the matter was continued to January 7, 1988, at defense counsel's request. On January 7, 1988, and thereafter, a series of trial continuances was granted to September 28, 1990, all at the request of the defense for reasons specifically related to the penalty retrial itself, and every day of which was covered by defendant's personal time waivers. On Friday, September 28, 1990, with the agreement of both counsel, the trial was continued until the following Monday, October 1. Defendant did not affirmatively waive this weekend continuance, but neither did he object. At no time did defendant move in the trial court to dismiss the cause on speedy-trial grounds.

With respect to the penalty retrial, defendant does not argue that his speedy-trial rights attached any earlier than the issuance of our remittitur in *Anderson I.* On the other hand, from and after the time our remittitur issued, defendant remained under the actual restraints imposed by his affirmed conviction on capital charges, and we may therefore assume that the rights he asserts attached no later than that time. (See *United States v. Marion* (1971) 404 U.S. 307, 320 [92 S.Ct. 455, 463, 30 L.Ed.2d 468]; *People v. Martinez* (2000) 22 Cal.4th 750, 755 [94 Cal.Rptr.2d 381, 996 P.2d 32] (*Martinez*); see also § 1382 [statutory right to retrial within 60 days after issuance of remittitur on appeal].) Nonetheless, defendant fails to establish that the subsequent trial delay violated either his state or his federal constitutional rights.

■ To determine whether federal speedy-trial rights were violated, courts apply a balancing test involving four factors: length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. (*Barker v. Wingo* (1972) 407 U.S. 514, 530 [92 S.Ct. 2182, 2192, 33 L.Ed.2d 101] (*Barker*); *People v. Roybal* (1998) 19 Cal.4th 481, 512 [79 Cal.Rptr.2d 487, 966 P.2d 521] (*Roybal*).) In *Barker,* the high court noted that the defendant's "responsibility" to assert his right is closely interrelated to the other factors. (*Barker, supra,* at p. 531 [92 S.Ct. at p. 2192].) The court explained that because "[t]he more serious the deprivation,

the more likely a defendant is to complain," the defendant's assertion of his speedy-trial right is entitled to strong evidentiary weight on the issue whether he is being deprived of the right. (*Id.*, at pp. 531-532 [92 S.Ct. at p. 2192].) On the other hand, the court "emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." (*Id.*, at p. 532 [92 S.Ct. at p. 2193].)

 Here, the delays were for defendant's benefit, not the result of prosecutorial negligence or bad faith. (See *Doggett v. United States* (1992) 505 U.S. 647, 656 [112 S.Ct. 2686, 2693, 120 L.Ed.2d 520] (*Doggett*).) Moreover, defendant not only failed to complain, he personally waived all the delays except the final weekend continuance. Nor does defendant demonstrate prejudice. He cannot claim the delay unfairly prolonged his incarceration (see *Roybal, supra*, 19 Cal.4th 481, 513), because we had theretofore affirmed his conviction on capital charges that subjected him, at a minimum, to life imprisonment without possibility of parole. And he adverts to no specific way in which his defense was compromised. (See *id.*, at pp. 513-514.)

Defendant urges that the length of the delay rendered it "presumptively prejudicial." In *Doggett, supra*, 505 U.S. 647, the court concluded that an eight-and-one-half-year delay between indictment and trial produced a presumption of prejudice. But even there, the court was careful to note that other elements of the *Barker* test also indicated a deprivation of the defendant's rights; much of the delay was attributable to government negligence, and the defendant had not acquiesced. (*Doggett, supra*, at pp. 656-658 [112 S.Ct. at pp. 2693-2694].) Here, defendant himself created and consented to the much shorter delay at issue in this case. We cannot conclude he thereby manufactured federal constitutional grounds to overturn the death judgment against him. No federal speedy-trial violation occurred.[21]

 Where its terms govern, section 1382, California's speedy-trial statute, is " 'supplementary to and a construction of' " the *state* constitutional

---

[21]Though neither this court nor the United States Supreme Court has decided the precise issue, it would appear, in any event, that defendant's express personal on-the-record agreement to all but one of the continuances constituted absolute waivers, to that extent, of his speedy-trial rights under the federal Constitution. (See *Barker, supra*, 407 U.S. 514, 525-526 [112 S.Ct. 2182, 2189-2190] [constitutional speedy-trial right is fundamental right, waiver of which cannot be presumed from silent record]; *People v. Johnson* (1980) 26 Cal.3d 557, 566, fn. 6 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255] [federal constitutional speedy-trial right is waivable only through knowing, voluntary, and intelligent decision of defendant himself]; see also *New York v. Hill* (2000) 528 U.S. 110, 114-118 [120 S.Ct. 659, 663-666, 145 L.Ed.2d 560] [all rights, including fundamental rights, are waivable; counsel's agreement to trial continuance beyond time limits provided by Interstate Agreement on Detainers constituted waiver of such limits despite lack of client's express personal agreement].)

speedy-trial guarantee, and the statute "implement[s]" that guarantee. (*Martinez, supra*, 22 Cal.4th 750, 766, quoting *People v. Godlewski* (1943) 22 Cal.2d 677, 682 [140 P.2d 381]; see *Sykes v. Superior Court* (1973) 9 Cal.3d 83, 89 [106 Cal.Rptr. 786, 507 P.2d 90].) Thus, a violation of the statute will entitle the defendant to dismissal regardless of prejudice. The constitutional guarantee may apply even where the statute does not, but when a claim of violation of the state constitutional speedy trial right goes beyond the statute, California law requires an affirmative showing of prejudice. (*Martinez, supra*, at pp. 766-768.)

■■■ As relevant here, section 1382 provides for dismissal of a felony action, unless good cause to the contrary is shown, if the case is to be retried following appeal, but is not brought to trial within 60 days after the appellate remittitur is filed in the trial court. (*Id.*, subd. (a)(2).) On the other hand, dismissal is not required if the defendant requests or consents to the setting of a trial date beyond the 60-day period, and the matter is brought to trial within 10 days after the date set. (*Id.*, subd. (a)(2)(B).)

Here, defendant did enter personal time waivers allowing the trial date to be continued to September 28, 1990. Trial began on October 1, 1990, within the 10-day grace period. The statutory speedy trial requirements were therefore satisfied. In any event, defendant waived any violation of section 1382 by his failure to timely object to the delay and thereafter move for dismissal in the trial court. (E.g., *Wright, supra*, 52 Cal.3d 367, 389.)

Accordingly, defendant cannot prevail on a statutory speedy-trial claim, nor can he succeed on a state constitutional theory dependent on violation of the statute. Moreover, as noted above, defendant has demonstrated no prejudice from the delay in bringing him to retrial. Hence, to the extent he claims a nonstatutory form of state speedy-trial violation, his claim must be rejected.[22]

■■■ Defendant's claims that delays in the appellate process have denied him due process and subjected him to cruel and unusual punishment also lack merit. Though excessive appellate delays may sometimes result in a denial of due process, defendant fails to identify any concrete prejudice from the delay, such as an impairment of grounds for appeal. Hence, his due

[22]We have never decided whether or how the fundamental state constitutional right (*Townsend v. Superior Court* (1975) 15 Cal.3d 774, 781 [126 Cal.Rptr. 251, 543 P.2d 619]) can be waived, except to suggest in dictum that counsel cannot waive it over his client's objection for counsel's own convenience (*ibid.*; see also *People v. Floyd* (1970) 1 Cal.3d 694, 696-697 [83 Cal.Rptr. 608, 464 P.2d 64]). But for reasons set forth in the preceding footnote, we readily conclude that the defendant's express personal agreement to trial continuances sought for his benefit constituted such a waiver.

process claim must fail. (*Horton, supra,* 11 Cal.4th 1068, 1141; see also *United States v. Loud Hawk* (1986) 474 U.S. 302, 313-314 [106 S.Ct. 648, 655, 88 L.Ed.2d 640]; *Coe v. Thurman* (9th Cir. 1990) 922 F.2d 528, 530.)

Finally, we must dismiss defendant's claim that his execution after two decades of confinement on death row would be cruel and unusual punishment. Defendant notes that two justices of the United States Supreme Court (Justices Stevens and Breyer) have expressed interest in this issue. (*Lackey v. Texas* (1995) 514 U.S. 1045 [115 S.Ct. 1421, 131 L.Ed.2d 304] (mem. opn. of Stevens, J., on denial of cert.).) However, we have consistently concluded, both before and since *Lackey,* that delay inherent in the automatic appeal process is not a basis for concluding that either the death penalty itself, or the process leading to its execution, is cruel and unusual punishment. (*People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29] (*Massie*); *People v. Hill* (1992) 3 Cal.4th 959, 1016 [13 Cal.Rptr.2d 475, 839 P.2d 984]; see also *Frye, supra,* 18 Cal.4th 894, 1030-1031.)

As we have explained, the automatic appeal process following judgments of death is a constitutional safeguard, not a constitutional defect (*Massie, supra,* 19 Cal.4th 550, 574; *People v. Hill, supra,* 3 Cal.4th 959, 1014), because it assures careful review of the defendant's conviction and sentence (*Frye, supra,* 18 Cal.4th 894, 1031). Moreover, an argument that one under judgment of death suffers cruel and unusual punishment by the inherent delays in resolving his appeal is untenable. If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while if the judgment is affirmed, the delay has prolonged his life. (*People v. Hill, supra,* 3 Cal.4th at pp. 1015-1016.) Indeed, from and after October 1987, when we affirmed the guilt judgment and special circumstance findings in *Anderson I,* defendant has had no conceivable complaint about his extended incarceration awaiting appeal, because life without possibility of parole was the minimum sentence he faced. We reiterate our determination that appellate delay in a capital case is not cruel and unusual punishment.

### 12. *Cumulative prejudice.*

Defendant urges that the cumulative prejudicial effect of the many constitutional errors at his trial requires reversal of the death judgment. However, we have identified no such errors, and, as explained at length above, the record provides no basis for concluding that any trial ruling or event defendant has challenged caused him unfair prejudice. Defendant's claim must therefore fail.

CONCLUSION

The judgment of death is affirmed.

George, C. J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I concur in the opinion of the court.

It has long been my position that we should vacate a sentence of death imposed on a criminal defendant as unreliable, in violation of both the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution and also the cruel or unusual punishment clause of article I, section 17 of the California Constitution, if trial counsel introduced in mitigation none of whatever evidence was available. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1385 [65 Cal.Rptr.2d 145, 939 P.2d 259] (conc. & dis. opn. of Mosk, J.) [implying that any sentence of death should be vacated as unreliable under the Eighth Amendment and article I, section 17 if trial counsel introduced in mitigation none of the available evidence]; *People v. Avena* (1996) 13 Cal.4th 394, 449-450 [53 Cal.Rptr.2d 301, 916 P.2d 1000] (dis. opn. of Mosk, J.) [same]; *People v. Lucas* (1995) 12 Cal.4th 415, 501-502 [48 Cal.Rptr.2d 525, 907 P.2d 373] (conc. & dis. opn. of Mosk, J.) [same]; *In re Ross* (1995) 10 Cal.4th 184, 216, fn. 1 [40 Cal.Rptr.2d 544, 892 P.2d 1287] (dis. opn. of Mosk, J.) [same]; *People v. Stansbury* (1995) 9 Cal.4th 824, 835 [38 Cal.Rptr.2d 394, 889 P.2d 588] (conc. & dis. opn. of Mosk, J.) [same], reiterating *People v. Stansbury* (1993) 4 Cal.4th 1017, 1074 [17 Cal.Rptr.2d 174, 846 P.2d 756] (conc. & dis. opn. of Mosk, J.), revd. *sub nom. Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293] (by the court); *People v. Diaz* (1992) 3 Cal.4th 495, 577 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (conc. & dis. opn. of Mosk, J.) [same]; see also *People v. Howard* (1992) 1 Cal.4th 1132, 1197 [5 Cal.Rptr.2d 268, 824 P.2d 1315] (conc. & dis. opn. of Mosk, J.) [finding a sentence of death unreliable under the Eighth Amendment and article I, section 17 when trial counsel introduced in mitigation none of the available evidence, albeit at the defendant's request]; *People v. Sanders* (1990) 51 Cal.3d 471, 531-533 [273 Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.) [same]; *People v. Lang* (1989) 49 Cal.3d 991, 1059-1062 [264 Cal.Rptr. 386, 782 P.2d 627] (conc. & dis. opn. of Mosk, J.) [same]; *People v. Williams* (1988) 44 Cal.3d 1127, 1158-1161 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. & dis. opn. of Mosk, J.) [to similar effect under the Eighth Amendment]; *People v. Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925] [same].)

In this case, I would not vacate the sentence of death imposed on Anderson as unreliable. To be sure, trial counsel did not introduce in mitigation any of the presumably available evidence relating to Anderson's background and character. But he did indeed introduce extensive evidence to raise a lingering doubt about Anderson's guilt of any of the murders in question. He proved unsuccessful in his efforts. He nevertheless made the attempt. That is enough.

**KENNARD, J.**—I concur in the majority's affirmance of defendant's judgment of conviction and sentence of death. I write separately because I think

a bit more should be said about defendant's contention that the trial court erred when it barred him from cross-examining prosecution witness Deborah Baros about her past treatment for mental illness. (See maj. opn., *ante*, at pp. 578-579.)

The Sixth Amendment to the federal Constitution guarantees the defendant in a criminal prosecution the right "to be confronted with the witnesses against him." In almost identical words, the California Constitution, in section 15 of article I, also secures the right of confrontation. The primary interest protected by the confrontation guarantee is the right of cross-examination, which is "the principal means by which the believability of a witness and the truth of his testimony are tested." (*Davis v. Alaska* (1974) 415 U.S. 308, 316 [94 S.Ct. 1105, 1110, 39 L.Ed.2d 347].) Because cross-examination implements the constitutional right of confrontation, a trial court should give the defense wide latitude to cross-examine a prosecution witness to test credibility. (*People v. Cooper* (1991) 53 Cal.3d 771, 816 [281 Cal.Rptr. 90, 809 P.2d 865]; *Curry v. Superior Court* (1970) 2 Cal.3d 707, 715 [87 Cal.Rptr. 361, 470 P.2d 345].) But the trial court retains discretion to restrict cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183].) The test for determining whether a trial court has abused its discretion in restricting defense cross-examination of a prosecution witness is whether a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624 [66 Cal.Rptr.2d 609, 941 P.2d 788]; *People v. Cooper, supra,* at p. 817.)

Mental illness, insofar as it affects a witness's ability to accurately perceive, remember, or describe the events about which the witness is testifying, or establishes a bias against the defendant, is relevant to credibility and may be established by cross-examination concerning the witness's clinical history of diagnosis or treatment. (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072 [25 Cal.Rptr.2d 213]; *People v. Cooks* (1983) 141 Cal.App.3d 224, 302 [190 Cal.Rptr. 211]; *Boggs v. Collins* (6th Cir. 2000) 226 F.3d 728, 742; *Chnapkova v. Koh* (2d Cir. 1993) 985 F.2d 79, 81; *U.S. v. Butt* (1st Cir. 1992) 955 F.2d 77, 82, 86; *United States v. Lindstrom* (11th Cir. 1983) 698 F.2d 1154, 1160; Annot., Cross-examination of Witness as to His Mental State or Condition, to Impeach Competence or Credibility (1972) 44 A.L.R.3d 1203, 1222-1226, § 6, and cases cited; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 261, p. 332.)

"Factors a court should consider in allowing in such evidence are the nature of the psychological problem, the temporal recency or remoteness of

the condition, and whether the witness suffered from the condition at the time of the events to which she is to testify." (*Boggs v. Collins, supra,* 226 F.3d at p. 742.) For example, a mental illness that causes hallucinations or delusions is generally more probative of credibility than a condition causing only depression, irritability, impulsivity, or anxiety. (See *U.S. v. Butt, supra,* 955 F.2d at pp. 82-83; *United States v. Lindstrom, supra,* 698 F.2d at p. 1160.) And a trial court generally may preclude cross-examination about psychiatric treatment occurring many years before the trial or hearing at which the witness testifies and long before the events to which the witness testifies. (See *People v. Rodriguez* (1986) 42 Cal.3d 730, 749 [230 Cal.Rptr. 667, 726 P.2d 113]; *Hodges v. Keane* (S.D.N.Y. 1995) 886 F.Supp. 352, 355.)

Here, the trial court did not abuse its discretion in disallowing the proposed defense cross-examination of prosecution witness Deborah Baros about her clinical history of mental illness. The defense offer of proof, based on Baros's testimony at the hearing to determine her competence, indicated only that Baros's children were taken away from her, Baros had been diagnosed as "emotionally disturbed," she had taken prescription medications, and she had received therapy for a condition called "mental anguish." This evidence would not have been particularly helpful in attacking her credibility because it did not demonstrate a condition likely to affect her ability to perceive or recall, nor is it apparent that it would give her a motive to falsely accuse defendant, who apparently had nothing to do with Baros's loss of her children. Moreover, the defense was allowed to effectively demonstrate Baros's mental illness by showing that she was fantasizing or hallucinating about the existence of the child she referred to as Anthony and her pregnancy at the time of the 1978 Mackey murder. Because a reasonable jury would not have received a significantly different impression of Baros's credibility had the excluded cross-examination been permitted, the trial court did not abuse its discretion.

Werdegar, J., concurred.

Appellant's petition for a rehearing was denied June 20, 2001.